THE STATE OF OREGON, RESPONDENT, *v.* ARCHIE BROWN, JOINTLY INDICTED WITH JAS. JOHNSON, AND JOS. SWOARDS, APPELLANT.

HOMICIDE IN COMMISSION OF ROBBERY—PURPOSE TO KILL.—A homicide committed in the perpetration of rape, arson, robbery, or burglary, is, under section 506 of the criminal code, murder in the first degree. In such a case a purpose to kill is incontrovertibly implied from the crime n which the person committing the homicide is engaged at the time.

ROBBERY, WHEN COMPLETED—REMOVAL OF GOODS.—The taking of goods, to constitute robbery, is not necessarily concluded so as to complete the crime, by the removal of the goods beyond the presence of the owner, and to constitute a killing during a robbery it is not necessary that the killing should be committed at the precise place and time of the act of violence. Three persons entered a store, struck the proprietor blows which rendered him insensible, took the contents of his safe and proceeded up the street, carrying the property with them upwards of three blocks of two hundred feet each, where they turned and fired upon a person who was endeavoring to prevent their escape and killed a boy: *Held*, that the removal of the property having been continuous and uninterrupted, the killing was done during the robbery.

ERROR—WHEN DEFENDANT IS NOT PREJUDICED.—Where the commission of
a robbery at the time of the killing was relied upon to constitute the
homicide murder in the first degree, the court charged the jury that if
they found that the killing took place after the robbery was completed,
the defendant should be acquitted: *Held*, that such instruction was
erroneous, but that it could not have prejudiced the defendant in any of
his substantial rights.

APPEAL from Multnomah county. The facts are stated in
the opinion of the court.

*W. W. Page, and Stott & Gearin,* for appellant:

To constitute murder in the first degree in this state it
is necessary that the killing be purposely done. (*Fouts* v.
*State,* 8 Ohio St. 98; *Robbins* v. *State,* Id. 131, 173, 175, 190;
*Kain* v. *State,* Id. 307; *Hagan* v. *State,* 10 Id. 459; Id. 599;
*Johnson* v. *Com.,* 24 Pa. St 387.)

The court charges the jury that where the killing occurs
in the perpetration of rape, arson, robbery or burglary, a
purpose to kill need not be alleged or proved. Is such a
charge consonant with the statute or consistent with reason
or common sense? If it be, then is our statute a huge
blunder, and our claim to an enlightened administration of
justice an idle vaunt—a snare to lead us on to an interminable series of cruel mistakes. Section 506 of the statute is
certainly clear enough, of itself, to show that a purpose to
kill is one of the essential ingredients of murder in the first
degree. But if it were not so, and, recognizing the rule
that an antecedent provision of a statute of which the meaning may be doubtful, is often best explained by a subsequent
section of the same statute, we quote sec. 511, p. 407, Crim.
Code: "If any person shall, in the commission of an unlawful act, or a lawful act without due caution or circumspection, involuntarily kill another, such person shall be deemed
guilty of manslaughter." Is this section entirely a nullity,
or does it mean something? Is it possible that rape, arson,
burglary or robbery are not unlawful acts? Or shall we be
told that by the very language of the statute, under a given
state of facts, a man is guilty of murder in the first degree
or manslaughter, as it may suit the pleasure of the prosecut-

ing attorney to elect, and that the legislature intended that such a gross absurdity should come from its hands? Clearly so, if the charge of the court in this case is to be sustained. If it was intended that involuntary killing in rape, arson, robbery or burglary, was to be murder in the first degree, and in other unlawful acts only manslaughter, why did not the legislature so declare? How easy it would have been, had the legislature so intended, to have inserted in section 511, "except the cases provided for in the first section of this act." Will this court presume that the legislature intended to trifle with so grave a subject to such an extent that the highest degree of criminal homicide could not be distinguished from the lowest? Or shall we, guided by reason, justice and humanity, conclude that the legislature really meant what they said, and before a man can be decreed to suffer the extreme penalty of the law, it is necessary that a purpose to kill be alleged and proved. The theory upon which this instruction was given, is, that the being engaged in the felony supplies both malice and purpose to kill. But this is a wrong assumption, for we see in section 519, immediately following, that the being engaged in a felony supplies only the malice contemplated in the statute. By what system of reasoning then can we say that there can, under any possible circumstances, be a murder under our statute, without a purpose to kill. We are aware that at common law such was the case, but the doctrines then promulgated were applicable to a day and age that is past, and have long since been swept away before the advancing waves of a purer and more humane exposition of the law which has followed.

To tell the jury that they must convict of murder in the first degree or acquit, was actually instructing them to convict, and every possibility of convicting of the second degree or of manslaughter was at once taken from their consideration. Although the robbery might have been completed, could not the larceny have continued? And if the larceny was still continuing, would not a killing in the commission of larceny be murder in the second degree, under our statute? (Crim. Code, secs. 184, 507.) There is no robbery

charged in the indictment, and the killing is not alleged to have been done in the commission of a robbery. It was, therefore, error to charge the jury that the indictment charged the killing to have taken place during the commencement of a robbery. We submit that in an indictment for robbery, not being armed with a dangerous weapon, under our statute it is necessary to state that the taking was from the person by force and violence. (Crim. Code, sec. 534, p. 410.) The indictment in this case does not so state, but contains only what might be used as a definition of larceny from the person. There is violence to the person in all larcenies from the person, but there must be the additional ingredient of force to constitute robbery.

The appellant requested the following instruction: "If you believe, from the evidence in this case, that the killing of Louis Joseph occurred, not in the building occupied by Walter O'Shea, and not at the place nor in the building where the property mentioned in the indictment was stolen, if any was stolen, but that such killing occurred some two or three blocks removed therefrom, and while the defendant, Brown, was endeavoring to escape, you can not find the defendant guilty of murder in the first degree." Which instruction the court refused to give. This was error. (*People* v. *Pool,* 27 Cal. 582.)

The court charged the jury in effect that the robbery would have been complete had the goods, which were the subject of the robbery, been thrown away or concealed; but while the goods were still in the robber's possession, the robbery was continuing. This was erroneous, and leads directly to the conclusion that a robber's casting away goods, showing an intention to abandon his enterprise, only aggravates the offense, and makes that a complete robbery, which but for such act would be only an attempt to commit robbery. Again, if this be the law, when does the robbery end for the purposes of prosecuting for it. Suppose there had been no killing in this case, and the parties had been arrested on the corner of Third and Morrison. Upon an indictment against them for robbery, admitting the facts proven by the state, would not a jury

be justified in finding them guilty of a completed robbery? And if the robbery was complete for the purpose of prosecuting those engaged in it, why should it not be complete to avail the defendant in this case? Then suppose the parties had separated in making their escape, and each carried a portion of the plunder, and Brown had run out into Washington county, Swoards into Clackamas, and Johnson into Columbia, into each of which counties they could have got into in a short time; and suppose further that Johnson had accidentally discharged his pistol in Columbia county, and unintentionally killed a human being, would Brown and Swoards each be guilty of murder in the first degree for this? It would hardly be contended that such a conviction would be right, and yet, under the view of the law as given to the jury in this case, no other conclusion could be arrived at.

Robbery, both at common law and under the statute, is treated as a crime against the person; larceny as a crime against the property. How, then, can it be said that robbery follows the property, and not the person? The force and violence or assault, or the putting in fear of force and violence or assault, must be to the person and not to the property; and the parties defendant once having got beyond the presence of the person, having reached such a distance that the force and violence could be no longer used nor feared, this constituent element of robbery no longer existed; they were neither assaulting nor putting in fear of assault, and consequently were not engaged in the commission of a robbery, although the larceny still continued. (2 Arch. Criminal Practice and Pleading, 1288, 1289, 1291, 1292, 1297, 1301.) In a capital case, where there is error shown, it will be presumed to have injured the defendant, unless the contrary is clearly shown. (47 Cal. 103.)

*J. F. Caples, District Attorney, and M. F. Mulkey,* for the state:

The first objection is raised on the demurrer to the indictment. It is insisted that it does not state facts sufficient to constitute a crime, because it does not allege a pur-

pose on the part of the defendants to take the life of Louis Joseph, the person killed. In answer to this objection we have to say: That the indictment conforms to the requirements of chapter 8 of the Criminal Code of this state. It was framed after form No. 2 of the appendix and fulfills every requirement of section 71, and is sufficient under the code. (Form No. 2 of Appendix Code, 457; *State* v. *Dodson*, 4 Or. 64.)

But it is not necessary to allege or prove a purpose to take life in a case like this, where it is alleged that the homicide was committed in the perpetration of a robbery. It is murder in the first degree without the allegation of purpose or of deliberate and premeditated malice. Every evil intent and purpose in one engaged in such high crime is laid implied. (Crim. Code, p. 457, sec. 787; Wharton on Homicide, sec. 183; 53 Ind. 412; *People* v. *Vasquez*, 49 Cal. 560; 6 Am. Rep. 533; *State* v. *Garraud*, 5 Or. 216.)

But the indictment is not liable to the objection that it does not allege a purpose to take human life. It does allege a purpose to take the life of Sprague, not in the exact words of the statute, but in words conveying the same meaning. Section 79, page 350, of the Criminal Code, provides that "words used in the statute to define a crime need not be strictly pursued in the indictment, but other words conveying the same meaning may be used." The indictment alleges that the defendants "maliciously assaulted Daniel Sprague, with intent then and there to kill and murder him," and by the same act killed and murdered Louis Joseph. This clearly shows that the act was one of intention and purpose, and not the result of misadventure and accident. If they intended to kill Sprague, and assaulted him with a dangerous weapon with such intent while engaged in the perpetration of a robbery, every other evil purpose and intent is implied in the killing of Louis Joseph, and it is murder. At common law it would be murder; it is nothing less under our statute. (Wharton on Homicide, sec. 184.)

Where there is a taking by violence the violence follows the act of taking until it is completed. O'Shea having

been rendered insensible by the blows of the robbers prior to the taking, the act of taking, while he so continued to be insensible, is presumed to have been a taking by violence, since it was a taking in consequence of the violence and while the effect of the violence was continuing. The act of taking being then by violence necessarily implies that the entire act of taking was by violence.

The true boundaries of the robbery are limited by the acts of the robbery. These acts may continue through many minutes. They are not limited to a precise time or a particular spot. The robbery continues until the last act of the robbery is completed—until, in other words, the act of taking (the first act of taking) is completed. It is not practicable to assign any other limits to the crime. It is irrational to say that the robbery must have ended when the removal of the goods had continued precisely so many inches or feet from O'Shea, or when it had reached the doorway of the room or an aperture in the wall. Neither the act of carrying away nor the effect of the violence can have any such limits. Each case must rest upon its own circumstances, and the circumstances of this case are exceptional. Had this been a case where the robbers struck or violently snatched his purse from O'Shea's hand, and having then made away with it, killed a person two or three blocks away, while O'Shea, in the possession of his usual faculties, remained at the place where the act of violence was done, there would be greater force in the position of counsel for the defendant. In such case it might be argued that when the purse was removed beyond O'Shea's presence he relinquished it by not making pursuit, and that the robbers' possession ceased to be violent and was complete. But in the present case there was no relinquishment of his property or of pursuit by O'Shea. The violence having deprived him of his capacity to act was in fact continuing at the moment of the shooting.

It is argued that the consequence of this doctrine would be to make it possible to continue a robbery into another county, and to a distance of hundreds of miles, which would be absurd. It is time enough to deal with such

cases when they arise. It is possible, however improbable, that a county boundary line may run through the middle of a room in one part of which there may be a violent taking of property from the owner and a removal over the line into the other part, and yet the owner's presence may be immediate all the time. In the other case there may be a taking by violence, and the owner refusing to part with his property keep continuously in sight of it and continuously struggle to regain it, while the robbers are proceeding on their way with it and repelling the owner's efforts by violence. This may continue for many miles, and yet it will scarcely be denied that the elements of the crime of robbery in this case are present all the while.

In this case the instructions of the court precluded the jury from finding that the robbery was continuing at the time of the shooting unless all these elements of the crime were present. The jury were so instructed as to preclude them from finding against the defendants unless they found that the robbers at the time of the killing were in the same act of carrying away that was begun in O'Shea's immediate presence, that there had been no interruption or delay, no putting down of the goods, no intervention of another act inconsistent with the act of carrying away; that the carrying away was continuous and uninterrupted, near in time and very near to the place where the act was begun; that it was the same act of carrying which the act of violence had given the opportunity for; that they were engaged at the moment in the furtherance of their plan, and were endeavoring to prevent its frustration. And further, they were instructed that there must have been no opportunity to secrete or secure the fruits of the robbery. These instructions do not admit of a case where the robbery can not be said to continue in any reasonable view of it. ·

The feloniously and violent "taking" that was commenced in the presence of O'Shea and continued uninterruptedly in his absence, away from him, was undoubtedly a portion of the *res gestæ* and occurred during the criminal enterprise and in furthering its object. (3 Greenleaf, sec. 228; *Bissot* v. *State,* 53 Ind. 413; *Stocking* v. *State,* 7 Id. 327; Revised Stat-

utes of Indiana, sec. 388; 2 East, P. C. 709; 1 Russ on Crimes, 876; *State* v. *Pool*, 27 Cal. 576.)

The question in this case involves the construction of section 506, and is a new question in this state. We claim that the section should be construed as though it read: If any person shall purposely and of deliberate and premeditated malice kill another, or in the commission or attempt to commit any rape, arson, robbery or burglary, "kill another," such person shall be deemed guilty of murder in the first degree. The words "kill another" are understood after the word "malice" in the second line, and such reading evidently conveys the true meaning of the section and the intention of the legislature. The Indiana statute, which is similar to ours, was so read and so construed by the supreme court of that state. (Revised Statutes of Indiana, sec. 388; *Stocking* v. *State*, 7 Ind. 331.)

The rule of the common law that penal statutes are to be strictly construed, does not apply to the code, but each provision is to be construed according to the fair import of its terms and with a view to effect its object and to promote justice. (Crim. Code, sec. 787.) To say that "purposely" qualifies every clause of the section is not such rendering as to give a fair construction of the sentence, but is a narrow, forced and unreasonable rendering.

How can deliberate and premeditated malice exist in the mind without a purpose? How can one perpetrate a "deliberate killing," or a "premeditated killing," without first willing or forming a purpose to kill? How can "malice exist without a purpose?" When an act is committed with deliberate and premeditated violence, can it be said that it was not intended? Is not the latter necessarily included in the former? Malice implies a wish or desire to vex and annoy; it is a wicked intention to do an injury. Can the mind deliberately and premeditatedly wish, desire and intend to do a criminal act, and in pursuance of such motive commit such act unintentionally and without a purpose to commit the criminal act? This would be absurd. When, then, it is conceded, as it is in the case cited in *Robbins* v. *State*, 8 Ohio State Reports, 177, that where a homicide is

committed in the perpetration or attempt to perpetrate any rape, arson, robbery or burglary, "deliberate and premeditated malice" is implied, how in human reason can it be said that guilty purpose and intention are not implied as well? (27 Cal. 585, 586; Am. Crim. Law, 5 ed., sec. 1084.)

By the Court, KELLY, C. J.:

The facts of this case, as they appear in the bill of exceptions, are substantially as follows: On the twenty-third day of August, 1878, in the city of Portland, the defendant Brown, in company with the co-defendants, Johnson and Swoards, entered the pawnshop of Walter O'Shea, locked the door behind them, knocked O'Shea senseless, and took from his safe, near where O'Shea was assaulted, the articles named in the indictment. These were put into a valise, and with the property in their possession the defendants broke out the back windows of the pawnshop and made their escape through an adjoining store into the street. They had been observed before leaving the shop and were pursued by Sprague, a constable, who had been notified of the robbery. After running four blocks of two hundred feet each, and across two streets of sixty feet each, pursued by the constable, they were about to be overtaken. When Sprague was within twenty-five feet of them, Brown was heard to say: "Don't let us run; let us make a stand." The defendants then all stopped, turned around and drew their revolvers. Brown fired at Sprague. The pistol ball missed him, struck the side of a tree, glanced off, and killed the boy Louis Joseph. After firing this shot Brown made several motions as though he was going to shoot Sprague, who was dodging from side to side of the tree behind which he was standing endeavoring to keep out of the range of Brown's pistol. After shooting the boy Joseph, the defendants ran across the street where a delivery wagon and horse were standing, got into the wagon with the property taken from O'Shea and drove off, Brown driving the horse and having a pistol on the seat beside him. The defendants did not know that Sprague was a constable.

The defendants were afterwards jointly indicted on the

twenty-second day of October, 1878, for the crime of murder. The crime is charged in the indictment as follows:

"Archie Brown, James Johnson and Jos. Swoards are accused by the grand jury of the county of Multnomah, by this indictment, of the crime of murder, committed as follows: The said Archie Brown, James Johnson and Jos. Swoards, on the twenty-third day of August, A. D. 1878, in the county of Multnomah and state of Oregon, were then and there unlawfully and feloniously engaged in the commission of the crime of robbery, by then and there feloniously taking, stealing, and carrying away twenty-two gold watches of the value of eleven hundred dollars; fourteen silver watches of the value of one hundred and forty dollars; two hundred fifty cent pieces, silver coin of the United States; two gold watch chains of the value of twenty dollars; the moneys and property of Walter O'Shea, from the person of Walter O'Shea and against his will, by violence to his person; and the said Archie Brown, James Johnson and Jos. Swoards, while then and there engaged in the commission of such robbery, maliciously, unlawfully and feloniously then and there assaulted Daniel Sprague with a pistol, then and there charged with gunpowder and leaden ball, by shooting at him, the said Sprague, with said pistol, with intent, him, the said Daniel Sprague, then and there to kill and murder. And the said Archie Brown, James Johnson and Jos. Swoards then and there by their said act of shooting at said Daniel Sprague as aforesaid, killed and murdered Louis Joseph by then and there shooting him with said pistol so loaded and charged with gunpowder and leaden ball as aforesaid, contrary to the statutes in such cases made and provided, and against the peace and dignity of the state of Oregon.

"Dated at Portland, in the county aforesaid, this twenty-second day of October, 1878.

"J. F. CAPLES, District Attorney."

On the twenty-eighth of October, 1878, the defendants demurred to the indictment, on the grounds:

1. That it charged more than one offense;

2. That the indictment is insufficient in law to constitute an offense.

The demurrer having been overruled, the defendant Brown was put upon his trial and convicted of murder in the first degree, as charged. On the twenty-first day of November, 1878, he filed his motion for a new trial, alleging:

1. Misconduct and irregularities of the jury that occurred during the trial;

2. Insufficiency of the evidence to justify the verdict, and that it is against law;

3. Error in law occurring during and at the trial, and excepted to by the defendant.

The motion for a new trial was overruled by the court and the defendant sentenced to be hung. From this judgment he appeals to this court. The first objection is raised on the demurrer to the indictment. It is insisted that it does not state facts sufficient to constitute a crime, because it does not allege a purpose on the part of the defendant to take the life of Louis Joseph, the person killed. The indictment is based on section 506 of the Criminal Code, which reads as follows: "If any person shall purposely and of deliberate and premeditated malice, or in the commission or attempt to commit any rape, arson, robbery or burglary, kill another, such person shall be deemed guilty of murder in the first degree."

It is insisted, on the part of the appellant, that the indictment is insufficient, because it does not charge that the defendant purposely killed Louis Joseph while in the commission of the robbery. The case of *Robbins* v. *The State*, 8 Ohio State R. 131, is referred to in support of this view. It is sufficient for us to say that while the statute of Ohio, defining the crime of murder, is somewhat similar to our own, yet there is such a difference between them as to warrant us in saying that the decision in that case is not in point in construing the statute of Oregon. In that case two out of the five judges dissented from the opinion of the court upon the very point now presented for consideration and which this court is urged to adopt. The reasons ad-

duced in support of that decision are unsatisfactory, and we decline to adopt them in construing our own statute.

In an indictment for murder in the first degree under our code it is necessary to allege that the killing was done purposely, and of deliberate and premeditated malice, except in cases where the killing was done in the commission or attempt to commit any rape, arson, robbery or burglary, in which cases it is not necessary to allege in the indictment that the killing was done either purposely or with deliberate and premeditated malice. The meaning of the section, according to grammatical rules of construction, is as though it read as follows: "If any person shall purposely, and of deliberate and premeditated malice, kill another, or if any person shall, in the commission or attempt to commit any rape, arson, robbery or burglary, kill another, such person shall be deemed guilty of murder in the first degree."

When a homicide takes place in the commission of a robbery it is not necessary, in order to constitute murder in the first degree, that the one perpetrating it should purposely kill the person slain, and where purpose is not required to, constitute the crime it need not be alleged in the indictment.

Section 71 of the Criminal Code declares that " the manner of stating the act constituting the crime, as set forth in the appendix to this code, is sufficient in all cases where the forms there given are applicable."

The indictment in this case literally conforms to the precedent published in the appendix to the code. (*State of Oregon* v. *Dodson*, 4 Or. 64.) And we hold it to be good and sufficient in law.

On the trial of this cause, and during the impaneling of the jury, the following proceeding took place, as appears from the bill of exceptions: " Chas. Mitzner, a juror, being called to sit as a juror on the above entitled case, in response to questions upon the *voir dire* touching his qualifications to serve as such juror, answered, among other things, as follows: 'I have now an opinion as to the guilt or innocence of this defendant. It would take evidence to remove such opinion from my mind.' Whereupon defendant, by his

counsel, duly challenged said juror for cause, and the court propounded the following question to said juror: 'What do you mean by an opinion that would take evidence to remove? Do you mean that you could find this defendant guilty if no evidence at all were introduced?' To which question by the court as aforesaid, the said juror answered as follows: 'Of course, if the evidence should be different from what I heard it, I could not find him guilty.' The juror answered much more to the same effect as that stated in the foregoing answer, among the rest that he had no fixed opinion. Whereupon the court overruled defendant's said challenge to said juror, to which question by the court, and answer from said juror, and the overruling of said challenge the said defendant, by his counsel, then and there duly excepted."

It is now insisted that the circuit court erred in overruling the defendant's challenge to the juror. Section 185, page 143, of the code, declares that, "a challenge for actual bias may be taken for the cause mentioned in the second subdivision of section 183. But on the trial of such challenge, although it should appear that the juror challenged has formed or expressed an opinion upon the merits of the cause from what he may have heard or read, such opinion shall not of itself be sufficient to sustain the challenge, but the court must be satisfied from all the circumstances, that the juror can not disregard such opinion, and try the issue impartially."

It is very questionable whether the decision of the court in sustaining or overruling the challenge for actual bias in a juror is the subject of review in this court. We are inclined to think it is a matter altogether discretionary with the court, after taking all the circumstances into consideration. As this point was not argued, we do not decide it now. Certainly it can not be considered here, unless all the testimony be preserved which the court had or heard upon the trial of the challenge; and it appears from the record that this was not done. From what was preserved we think the challenge was properly overruled.

The next assignment of error arises under the bill of ex-

ceptions, and is as follows: "The regular panel of jurors having been exhausted before a jury in said case could be obtained, the court ordered a special venire to issue, directed to the body of the county, and to be drawn therefrom. In pursuance of which special venire so issued as aforesaid, the sheriff summoned, among others, one Hosford, who upon examination made by the defendant's counsel touching his qualifications to serve as a juror in said case, among other things, answered as follows: 'I was present in the court-room this morning during the drawing of jurors in this case, and was summoned immediately after adjournment of court and while I was on the court-house steps; am not on the regular panel.' Said juror stated that he was a farmer and resided some miles from the city. Defendant, by his counsel, objected to said juror on the ground that he was a bystander, and not drawn from the body of the county, in accordance with the special venire; and thereupon challenged said juror for cause. The court overruled the challenge, and defendant, by his attorneys, then and there to such overruling of such challenge duly excepted."

Hosford might have been a bystander when the court was in session in the morning, but after adjournment he was not. He resided some miles from Portland, and was of the body of the county.

The next assignment of error arising under the bill of exceptions is as follows: "On Tuesday morning, after the coming in of court and jury, the court announced that it had been brought to the attention of the court that there had been misconduct on the part of some of the jurors during the morning, and previous to the meeting of court. That it had been reported to the court that one of the jurors had, during the morning, and against the order of the court in that respect, before made for the confinement of the jury, separated from his fellows and had gone out of the jury room to the stairs leading to the lower story of the court-house, and had brought a newspaper to the jury room. It was at an early hour, about half-past eight o'clock A. M. when the juror did this. It did not appear that he saw or

conversed with any person while so out, and the paper which he obtained and took to the jury room was the Daily Standard of that day, a copy of which is hereto attached and made a part of this bill of exceptions. The court thereupon inquired of the jury if such was the fact, when the jury replied in the affirmative. Whereupon the court submitted to counsel for the defense whether they would go on and try the case with the jurors already called as part of the jury? Counsel for the defense refused to waive any rights in the premises to afterwards, or at that time avail themselves, representing the defendant, of any misconduct on the part of the jury; when the court offered to discharge the jury and draw a new jury. Whereupon counsel for the defense stated that they would except to such discharge of the jury by the court, and to any order calling a new jury. Upon which, at the request of counsel for the state, the court allowed the jurors to sit, and the drawing of the jury was continued with the jurors already drawn as part of the jury to try said case. To all of which, defendant, by his counsel, then and there duly excepted."

There was nothing in the newspaper referred to in the exceptions in regard to the proceedings in the court in the case of *The State of Oregon* v. *Brown*, except the following: "The trial of Brown, the principal murderer in the O'Shea-Joseph tragedy was called in the circuit court. The afternoon was consumed in marching in citizens to serve as jurymen, most of whom were quickly bounced." We can not conceive how a juryman possessing common sense could be influenced in any way, either for or against the defendant, by reading that paragraph. The statute says: "Neither a departure from the form or mode prescribed by this code in respect to any pleadings or proceedings, nor any error or mistake therein renders it invalid, unless it has actually prejudiced the defendant or tend to his prejudice in respect to a substantial right." (Crim. Code, 362, sec. 170.)

We see nothing improper in the court permitting jurymen sitting in the trial of a criminal cause to read newspapers when the trial is not progressing, if such papers

contain no testimony or comments upon the case which they are impaneled to try.

When the testimony in the case was all before the jury, the defendant, by his counsel, asked the court to instruct the jury as follows: "If you believe from the testimony in this case that the boy, Louis Joseph, was actually killed by a pistol shot fired by the defendant, and that said shot was fired, not at said Louis Joseph, but at one Daniel Sprague, and that the killing of said Louis Joseph was not purposely intended, you can not find the defendant guilty of murder in the first degree." We hold that there was no error committed by the court below in refusing to give this instruction. The defendant was accused in the indictment of having killed Louis Joseph in the commission of a robbery, and if the evidence given on the trial satisfied the jury beyond a reasonable doubt that such was the fact, then no purpose or intention to kill was required to be proven in order to constitute murder in the first degree. The instruction asked was not applicable to the case, and was properly refused by the court.

The next two instructions asked by the defendant's counsel may be considered together. They are as follows: "To constitute murder in the first degree in this state it is necessary that the killing be purposely done," and "To constitute murder in the second degree in this state it is necessary that the killing be purposely done." These are mere abstract propositions without any reference to the evidence in the case, and were properly refused by the court. (*Shattuck* v. *Smith*, 5 Or. 125.) The defendant then asked the court to give the jury the following instructions: "If you believe from the evidence in this case that the killing of Louis Joseph occurred not in the building occupied by Walter O'Shea, and not at the place nor in the building where the property mentioned in the indictment was stolen, if any was stolen, but that such killing occurred some two or three blocks removed therefrom, and while the defendant Brown was endeavoring to escape, you can not find the defendant guilty of murder in the first degree." "To con-

stitute murder in the first degree, the unlawful killing must be accompanied with a clear intent to take life."

"I charge you that a robbery is complete when the goods which are the subject of the robbery are removed from the person and immediate presence and control of the party robbed." "If, from the testimony before you, you have a reasonable doubt as to whether defendant fired the shot which killed Louis Joseph, or as to whether such shot was fired with an intent to take life, or prevent pursuit, you can not find the defendant guilty as charged." "If you believe from the evidence in this case that the killing, if such was done, was committed while the defendant was trying to get away, and after the robbery was committed, you can not find the defendant guilty of murder in the first degree."

These instructions were asked by the defendant and refused by the court, to which rulings the defendant excepted.

The court, in its general charge to the jury, substantially passed upon the questions involved in these several instructions asked by the defendant; and when they each required a modification to meet the views of the court, it had a right to refuse to give them to the jury, and to give them as modified and explained by the court.

The charge to the jury was in writing, and the defendant excepted to the whole of it. We, therefore, consider together ·the instructions asked and the charge given and excepted to. Together they present the great question whether the case was properly or improperly submitted to the jury for their consideration. As the entire charge of the court to the jury was excepted to, we here present it, except some immaterial portions, so that it and the instructions asked may be considered together. It is as follows:

"Under our code you may, in a case like this, find the defendant not guilty, guilty of murder in the first degree, of murder in the second degree; or of manslaughter.

"Murder in the first degree is where one purposely, and of deliberate and premeditated malice, kills another, or where one while in the commission of, or in the attempt to commit rape, arson, robbery, or burglary, kills another.

" Murder in the second degree is where a person purposely and maliciously, but without deliberation or premeditation, or in the commission or attempt to commit any other felony than rape, arson, robbery, or burglary, kills another, or where a person by an act imminently dangerous to others, evincing a depraved mind, regardless of life, although without the design to effect the death of any particular person, kills another.

"Manslaughter is where a person without malice, express or implied, or without deliberation, upon a sudden heat of passion caused by a strong provocation, kills another, or where a person in the commission of an unlawful act, or in the commission of a lawful act, without due caution or circumspection, involuntarily kills another.

"The difference between murder in the first degree and murder in the second, is this: There must be deliberation, premeditation and malice to constitute murder in the first degree, unless the killing is done in the perpetration of a rape, arson, robbery, or burglary, while premeditation and deliberation are not necessary to constitute murder in the second degree; but where the ingredients of premeditation, deliberation and malice are all wanting, and where there is a voluntary killing in a sudden heat, it is manslaughter.

"Under this indictment it is not necessary to prove expressly either a purpose to kill, or deliberate and premeditated malice. The indictment having alleged the killing in the perpetration of a robbery, it is only required that the robbery and the killing, in the manner alleged, during the robbery, be proven to make out the case. In such a case, and under such proof, the intent to kill and the deliberate and premeditated malice are incontrovertibly implied.

"Robbery is the felonious taking of property from the person of another by force. The personal possession of the property by the party robbed may be actual or constructive. If the property is in his presence and control, though not on his person, it is sufficient. If a man knocks another down and takes from him property so in his presence and control, it is robbery. This is the well established rule of the law. There must be an actual taking and carrying away.

Such actual taking and carrying away, being necessary to the robbery, is a part of the robbery; and while those engaged in the criminal enterprise are in the act of so carrying away, they are in the act of the robbery. But such carrying away must be from the person, actual or constructive; that is, it must be the same carrying away by which the goods were removed from the immediate presence of the owner. If the goods are left, or thrown away, or concealed, and afterwards the robbers return and take them up and carry them away, this is a new asportation or carrying away and is not a part of the robbery. If there had been no interruption or delay in the removal, no putting down of the goods, no intervention of another act inconsistent with the carrying away; if the removal was continuous, uninterrupted, and near in point of time and place to the act of violence; if there had been no opportunity to secrete or secure the fruits of the robbery, and while in such act of carrying they shot and killed a person in the manner alleged, it is murder. Mr. Greenleaf, a very high law authority, speaking upon this subject of robbery, says: It is sufficient if it be proven that the taking by the robber was actually begun in the presence of the party robbed, though it was completed in his absence. The taking is not necessarily concluded by the removal of the goods beyond the presence of the owner. It may be concluded away from, and at a distance from his presence. It has been contended in this case that unless the killing, if there was a killing, took place at the precise time and place of the act of violence, it is not murder; that the robbery was completed as soon as there was any removal of goods, at the time of the violence. I direct you that such is not the law applicable in this case. There may be a completed robbery if there is any removal, however slight, of the goods taken. A case often referred to in the law books illustrates this: A person snatched a ring from the ear of a lady, but before he entirely withdrew his hand, dropped it in the curls of her hair, where it was found. It was held that there was a sufficient carrying away or asportation to make the crime complete. But in this case if the asporta-

tion had continued further the robbery would not have continued further. The precise point at which the crime is completed must vary with the circumstances of each case. As already stated, the carrying away of the goods or property which is the subject of the robbery, from the person of the owner, is a necessary ingredient in the crime. It is a part of the crime, as much so as the felonious taking or the violence. We can not, with rule and measure, mark the exact spot where the crime is completed, as we would distances upon the highway, nor can we mark the precise moment of its completion upon the dial plate. Crime is not a matter of addition or subtraction. It must be ascertained by the intentions and conduct of the persons engaged in it, by the objects which are disclosed by such conduct, and by their act in carrying out these objects.

"As already stated, if there was in this case a robbery, as alleged, and if those engaged in the robbery, within a few minutes of the act of violence, and very near the place where it occurred, were still engaged in or continuing in the same act of removing or carrying away that was begun in O'Shea's presence, and for which it was the object of the violence to afford an opportunity; if there had been no intervening act or interruption inconsistent with such carrying away, and if, while in such act, and in furtherance of it, and to prevent the frustration of their plan, the defendant, or either of his two companions (the three being together, and acting in concert from the beginning), deliberately fired at Sprague, and killed Louis Joseph, it is murder in the first degree.

"If you should find that the defendant shot at Sprague, and killed Joseph, but before such shooting the robbery had been completed, the defendant should be acquitted under the indictment. It having been alleged that while in the commission of the robbery, the defendant shot at Sprague with intent to kill Sprague, the shooting at Sprague and the intent to kill him must be proved, and they must be proved to have taken place before the completion of the robbery. An intent to commit murder is conclusively presumed from the deliberate use of a deadly weapon causing

death within a year.    The statute so provides.    So that, if you find that the defendant made use of a deadly weapon against Sprague, resulting in the death of the boy Joseph within a year, and that this was done before the robbery, if there was a robbery, was completed, the crime is made out as charged."

It is claimed by the defendant that the crime of robbery charged in the indictment as having been committed by Brown and his co-defendants was completed when they left the pawn shop of Walter O'Shea, and that the subsequent killing of Louis Joseph, three or four blocks away, was not done in the commission of the robbery; and exception is taken to that part of the charge of the court, which reads as follows: "To constitute robbery there must be an actual taking and carrying away.    Such actual taking and carrying away being necessary to the robbery, and while those engaged in the criminal enterprise are in the act of so carrying away, they are in the act of robbery.    But such carrying away must be from the person actual or constructive; that is, it must be the same carrying away or asportation by which the goods were removed from the immediate presence of the owner.    If the goods are left or thrown away, or concealed, and afterwards the robbers return and take them up and carry them away, this is a new asportation, or carrying away, and is not a part of the robbery. If there had been no interruption or delay in the removal, no putting down of the goods, no intervention of another act, inconsistent with the carrying away; if the removal was continuous, uninterrupted and near, in point of time and place, to the act of violence; if there had been no opportunity to secrete or secure the fruits of the robbery, and while in such act of carrying, they shot and killed a person in the manner alleged, it is murder."

The defendant admits that he committed a robbery in the pawn shop of O'Shea, but insists that the crime was completed when he and his co-defendants forcibly seized the property described in the indictment, and being completed, he denies that the killing of Joseph was done in the commission of the robbery.    We do not assent to the correctness

of this conclusion. If this interpretation be given to that part of section 506 which declares that any person who kills another in the commission of any rape, arson or robbery, shall be guilty of murder, then the statute will be practically nullified. If this construction be given to that section, then a man who commits a rape which results in the death of the woman, will insist that the crime having been perpetrated before his victim died, he did not kill her in the commission of that offense, and therefore he could not lawfully be punished for the crime of murder under that section of the law. When an incendiary applies his torch to a dwelling-house and sets it on fire, he has committed the crime of arson. If an hour afterwards, unknown to him, a human being should perish in the flames, ought the perpetrator of the deed to escape being punished as a murderer, because his victim was burned to death after the house was aflame?

The burglary is complete where the burglar, with intent to commit a crime, breaks and enters a dwelling-house at night. If, after having committed the crime, by entering the house, he should slay the owner while defending his property, could he escape punishment as a murderer under this statute, because the killing took place after the breaking into the house?

These crimes are referred to to show what would be the effect of construing the statute as the defendant insists it ought to be construed in the case under consideration. Must the killing precede the commission of the rape, arson or burglary in order to constitute murder under that part of the section? If so, then no one can be convicted under it, for the killing never takes place before the commission of either of those offenses.

When a person takes with force or violence the goods of another from his person or presence and against his will, he has committed robbery. Or to use the more exact phraseology of the old writers upon English criminal law, "an act of violence constitutes robbery," but it does not necessarily complete the crime. It constitutes robbery so far as to render the perpetrator liable to conviction for it;

but the act of robbery itself may be prolonged beyond the time when that liability is fixed. When Brown and his co-defendants took the property by force from the person or presence of O'Shea, they committed the crime of robbery so far as to render themselves liable to punishment for it, but the robbery in contemplation of law was not completed until the taking and carrying away was ended. The asportation of the goods is a necessary ingredient of the robbery, as essential to complete the crime as the violence to the owner, or as the seizure itself. And while anything remains to be done by the robbers to secure complete control over the property taken the robbery is incomplete. The act of taking and carrying away in the case of Brown and his co-defendants, commenced when the seizure was made in the pawn-shop of O'Shea, and continued until they had unmolested dominion over the property which they had taken. When they first acquired that control the robbery was ended, and not before.

From the statement of facts in the bill of exceptions we are satisfied that the asportation was one continuous act, from the violent seizure when O'Shea was stricken down senseless, until after Louis Joseph was killed. There was no cessation in flight; no casting away or secreting the property; no division of the spoils; no disposition to relinquish control of the goods. But on the contrary, there appeared to be a concerted action to keep possession of them and to defend that possession even if it became necessary to take human life to secure it.

This we regard as the fair construction to be put upon section 506 of the criminal code, and its application to the case of the defendant. The statute is to be construed according to the fair import of its terms; and not according to the rule of the common law, that penal statutes must be construed strictly. (Crim. Code, sec. 767.) It is the same construction as that which the supreme court of Indiana placed upon a statute of that state similar to our own. To give it any other construction would, as has already been stated, practically nullify that clause of section 506, and render it almost impossible to convict any

one of murder who should kill another in the commission or attempt to commit any one of the crimes enumerated. ·

After a careful consideration of this important point we are satisfied that there was no error. in that part of the charge to the jury by the circuit court.

There is an allegation of error in the charge of the court to the jury, when the instruction was as follows: "If you should find that the defendant shot at Sprague and killed Joseph, but before such shooting the robbery had been committed, the defendant should be acquitted under the indictment." In. giving this instruction we think the court erred, but it was an error in favor of the accused, and could not possibly prejudice his case before the jury. It is claimed, by the defendant, that this instruction left it optional with them only to convict the defendant of murder in the first degree, or to acquit him altogether.

We do not so regard it. The court had, in a former part of its charge to the jury, said to them: "Under our code you may find the defendant not guilty, guilty of murder in the first degree, of murder in the second degree, or of manslaughter." It was an error that worked no prejudice to any substantial right of the defendant, and under section 170 of the criminal code, is not such a one as to require a reversal of the judgment of the court below.

Having given this case the full consideration which its importance demands, we find no error in the proceedings of the circuit court, and its judgment is affirmed.