# CHARLESTON.

### STATE *v.* JESSE WILLIAMS.

### (No. 5185.)

### Submitted March 3, 1925.   Decided March 17, 1925.

1. HOMICIDE—*Testimony That One Accused of Murder in Commission of Robbery Was Without Money Immediately Before Killing, and Had Considerable Money Few Hours Thereafter, Is Admissible.*

   Where a murder is committed in the commission of a robbery, testimony to the effect that the accused was without money immediately before the homicide and that he was seen with considerable money a few hours after the time that the crime was committed, is admissible, as not only tending to connect the accused directly with the commission of the murder, but also to disclose a motive for its commission. (p. 465).

   (Homicide, 30 C. J., § 438.)

2. CRIMINAL LAW—*Refusal to Permit Accused to Say That He Did Not Attempt to Secrete Himself After Commission of Offense is Not Error.*

   It is not error to refuse to permit the accused to say that he did not make an effort to secrete himself after the crime was committed, as this is merely a conclusion of the witness, it being the province of the jury to determine the fact from the evidence. (p. 465).

   (Criminal Law, 16 C. J. §1532.)

3. HOMICIDE—*Conviction of Murder in First Degree in Commission of Felony May Be Had, Though no Previous Intent to Kill Is Shown, and Without Showing Deliberation, Wilfulness or Premeditation; Refusal to Instruct that State Has Burden to Prove Malice Before Conviction for Murder in First Degree in Committing Robbery Is Not Error.*

   Under section one of chapter one hundred and forty-four of the Code of West Virginia, which makes murder in the commission or in the attempt to commit a particular felony, such as robbery, murder in the first degree, the law will supply the necessary intent and malice in homicides coming within the provisions of the statute and conviction may be had although no previous intent to kill is shown, or it appears that there was no such intent, nor is it necessary to show

deliberation, wilfulness or premeditation. *Held:* It is not error to refuse the giving of an instruction telling the jury that the burden is upon the state to prove beyond all reasonable doubt, malice, express or implied, before they can convict for murder in the first degree.   (p. 468).

(Homicide, 29 C. J. 70, 87, 101.)

4.   CRIMINAL LAW—*If Evidence Tends to Show Murder Was Committed in Committing Robbery, Instruction as to What Constitutes Robbery Is Proper.*

Where the evidence tends to show that the murder was committed in the commission of a robbery, it is proper to instruct the jury as to what constitutes robbery.   (p. 466).

(Criminal Law, 16 C. J. §2360.)

(NOTE: Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.)

Error to Circuit Court, Marion County.

Jesse Williams was convicted of murder in the first degree without recommendation, and such conviction was affirmed by the circuit court, and he brings error.

*Affirmed.*

*Victor H. Shaw* and *David A. Ritchie,* for plaintiff in error. *E. T. England,* Attorney General and *R. Dennis Steed,* Assistant Attorney General, for the State.

WOODS, JUDGE:

Jesse Williams was tried in the Criminal Court of Marion County for the murder of Buck Williams; and upon a verdict of murder in the first degree without recommendation, was sentenced to be hanged. The Circuit Court of Marion County held that the judgment of the Criminal Court was plainly right; and the defendant prosecutes this writ of error.

Buck Williams, the deceased, a "jolly, good-natured fellow," lived alone at Uzztown, on the outskirts of Fairmont, in a small one-roomed shanty. This shanty was located near the top of a hill, and was connected with the street below, some three hundred feet away, by a path which led directly down the hill. Several houses were located along this path.

The first house below the shanty in question was occupied by Mary Anderson, and the next, by Elizabeth Wilson and children and Daisy Shelton. The furniture in the shanty, with the exception of a phonograph, belonged to Elizabeth Wilson, who also loaned the deceased certain cooking utensils from time to time, and for the purpose of having ready access to same, kept a key to the Yale lock on the door. The deceased also kept a pick and a .22 sixteen-shooter rifle in his shanty. He peddled ice in the community, transporting it on a wheelbarrow, and also was engaged in making home brew. On Tuesday, September 2nd, 1923, Mrs. Wilson ordered fifty pounds of ice, twenty-five pounds of which Buck delivered just about dark the same day, promising to deliver a like amount the following day. At the time of paying him, Mrs. Wilson noticed that the deceased had a ten dollar bill and several other bills. When he failed to make the ice delivery on Wednesday, she became uneasy, and on Thursday morning called him two or three times from the door of her house. Getting no response, she gave her key to the shanty door to Daisy Shelton, and told her to go up and see if Buck was still asleep. Daisy unlocked the door, went in, and found the deceased down on his knees at the bed with his head bowed over and it looked to her as if blood had been running from his ear; whereupon she became excited and ran out and called to Mrs. Wilson that he was dead, and one of Mrs. Wilson's neighbors called for the officers. C. P. Wheeler, a constable of Marion County, arrived on the scene at 1 o'clock and found the deceased in the position described above, dead, with his hip pockets turned inside out, the wallet with the bills as seen by Mrs. Wilson on Tuesday evening being gone. "There was a pool of blood under his head and at the foot of the bed, a little over, there was a big pool of blood, and a satchel standing at the foot of the bed covered with blood." Wheeler also found a pick, the eye of which was covered with blood, lying near the deceased, and a billiard cue broken in two pieces, lying on the floor, about five feet from the body, the loaded part of the cue having fallen out. These were the only weapons in the room. Dr. J. E. Offner made an examination of the body later in the day and found some

punctured places on the head, such as might have been made with the sharp point of a pick, and a fracture of the skull, such as might have been produced by the billiard cue. He testified that the deceased had been dead from forty-eight to seventy-two hours.

Jay Gould, a waiter in the Arcade Restaurant, saw the accused with the billiard cue, introduced in evidence, some time prior to the killing while at the home of Ora Davis, where accused lived at that time. Herbert Davis, son of Ora Davis, also identified the broken cue as the one with which he and another boy had been playing ball on Labor Day, September 1st; knew it by reason of certain paint on it; and testified that the last time he saw it was about dusk on Labor day, when he saw the accused pick it up and carry it away. On Tuesday evening, September 2nd, about 9 o'clock, the accused came to the Arcade Restaurant and asked Jay Gould to give him a bowl of soup but did not offer to pay for it. Between two and three o'clock, Wednesday morning, accused bought three or four pints of whiskey from D. Bostic, paying therefor $3.00 a pint. Between three and four o'clock of the same morning, he called at the house of Bud Jackson, on Spring Street, and inquired where Anthony VanLear lived. A few minutes thereafter he called at VanLear's house, at the end of Spring Street, and upon being asked what he was doing out at that time of night, said he was just "cruising" around town. He then gave VanLear a drink of whiskey, and they sat and talked until daylight. When VanLear mentioned something about getting his pistol out of pawn, Jesse told him that a man had given him a rifle which he would give him if he wanted it. They both walked down to where a boardwalk crossed Washington Street, and the accused ran his hand under the walk and got a .22 repeating Winchester rifle which accused carried back to Van Lear's house under his arm, having first wrapped it in his coat. Roger Bryan (Bright Eyes) testified that he saw both men pass his house between six and half-past six in the morning, and that Jesse had something under his coat. The accused and VanLear then took the rifle down, but, not being able to re-assemble it, laid it on the chair on the porch. They

sat on the porch until about 10:30 or 11 o'clock, having been joined in the meantime by Ed Smith, who saw the rifle and also saw the accused have some $25.00 or $30.00. These three men, together with VanLear's wife, got in VanLear's car and went to Shagtown to get something to drink. They picked up Ora Davis on the way, returned to VanLear's house, where both the accused and Ora Davis stayed until Friday morning, when the accused was arrested. The rifle was lost. VanLear stated that his wife saw a boy playing with the barrel, and that later the stock was found in the grass. This stock was again found by Gail Rice, who turned it over to the sheriff and one of his deputies. Mrs. Wilson was in the deceased's shanty on Labor Day, September 1st., and saw a rifle standing "over in the corner kind of behind the bed," while Daisy Shelton testified that she saw the rifle at different times before the murder "behind his bed." Both these witnesses, as well as Mrs. Mary Anderson, from whom deceased had bought the rifle a month and a half before his death, stated that the rifle was similar to the one exhibited by the State, at the trial, for comparative purposes. The stock of the rifle, which was found near the VanLear home, by Gail Rice, was also exhibited to the witnesses.

The accused states that he went to D. Bostic's house some time after 12 o'clock, asked for a room, but could get none. This is evidently the time that Bostic sold him the liquor, as has already been stated. Bostic testified that accused told him he (accused) and Ora had been having some trouble; that the city officers were looking for him; and if he happened to get in, he wanted him (Bostic) to help him out. Later, accused inquired of Eddie Johnson the way to Van-Lear's house, went there, arriving sometime before 6 o'clock, went with VanLear and got a rifle, which he stated Preacher Jackson had given him earlier that night, from under the board walk. As to his actions and declarations concerning the rifle, while at VanLear's, not heretofore detailed, the following taken from his cross-examination is significant: "Q. Do you remember VanLear showing the gun you gave him to Benny Smith and some of them at the house? A. Yes sir. Q. Do you remember telling VanLear, 'There you go

showing that gun to everybody. You will get me hung'? A. No sir, I don't remember anything like that. Q. What did you say? A. Van showed the gun to Smith and told him, 'I have bought me a brand new rifle this morning.' I said 'There you go, showing it to people. You will get me, yourself and everybody else into trouble. Preacher Jackson give it to me.' I said 'He could have stole it from some place.'" He testified later that they went to Shagtown after some liquor. He admitted that he saw some children playing with the cue stick on Sunday before the murder, but claimed that he had not seen it since, nor had it in his possession at any time. He claims that he saw Buck Williams the last time on Labor Day, and that he was not guilty of Buck's murder. His testimony as to his movements from the time he is shown to have been at the Arcade Restaurant at nine o'clock, Tuesday night, and his appearance at the Bostic house, where he purchased the liquor between two and three o'clock the same night, is wholly unsupported. Preacher Jackson testified that he never gave a rifle to accused. Accused was then again placed on the stand and testified that Preacher Jackson, who had just testified, was the man who gave him the rifle.

We have only given a general outline of the salient facts and circumstances of the case, and will now proceed in their light to consider the errors assigned.

The assignments of error, few in number, relate to the admission and rejection of testimony and to the giving and refusal of certain instructions.

The first assignment in regard to the testimony relates to a question asked Daisy Shelton, a witness for the State: "Did you ever see a rifle something like this up there?" To which she replied: "Yes sir, I have seen—". Before she could complete her answer, it seems, counsel for the defendant objected, and moved to exclude the answer from the jury, to which counsel for the state replied that there was no rifle offered in evidence and that this was only a preliminary question. Whereupon the Court overruled the motion. It is not clear whether or not it related to the rifle said to have been in the home of the deceased, previous to

the homicide. From the trend of the testimony it seems that parts of the rifle which the accused took from under the boardwalk, a few hours after the homicide had been committed, and which had been dismantled at the VanLear home, the barrel of which had been lost, was before the jury, as well as a new rifle of the same manufacture and design, which was used for the purpose of comparison. Neither appears to ever have been formally offered in evidence. It will be observed that the answer to the question was not completed. Counsel for the prisoner made no further objection to any testimony relating to the rifle, or parts thereof, so far as the record discloses. The objection to all this testimony would therefore be deemed to have been waived. However, any testimony in regard to the rifle seen in the home of the deceased, prior to the homicide, was admissible. In *Lindsay* v. *People,* 63 N. Y. 156, proof and a description of watches carried shortly before the murder, by deceased, followed by evidence that one of the watches was in the possession of the prisoner a few months thereafter, and seen only on a single occasion was proper. This is on the theory that possession of the fruits of a robbery or of the goods of a murdered man soon after the perpetration of the crime, is, unexplained, very persuasive evidence of the guilt of the one so found in possession of the goods. In the instant case, the .22 rifle was seen in the home of the deceased by Mrs. Wilson on Labor Day, the Monday preceding the homicide. The defendant was seen with the alleged rifle about six o'clock Wednesday morning. It is impossible to prescribe any definite rule as to the time beyond which a party accused of crime shall not be called upon to account for the possession of property stolen or taken from a murdered man. Burrill's Crim. Ev. 445. The more recent the possession the more cogent the evidence. Circumstances, such as the manner of keeping or using the articles may affect the inference to be drawn from the possession. The fact that a certain rifle was kept in the home of the deceased, that it was not there after the homicide, that a similar rifle was seen shortly thereafter in the possession of the accused, that he had attempted to conceal it, and did in fact conceal it, that he made false

representations as to where he obtained it, as the testimony in this case all tends to show, are matters for the consideration of the jury. It is claimed in argument, by counsel for the defendant, that it was not shown conclusively to have been the same rifle. In *People* v. *Collins,* (Cal.) 30 Pac. 847, on a trial for murder committed in a highway robbery it appeared there was taken from the murdered man two bars of gold bullion. It was held there that evidence that the defendant, shortly after the murder, disposed of two gold bars of the same value as those taken from the murdered man was properly received as a circumstance tending to show the defendant's guilt, though the bars taken and those sold were not shown to be the same. The Court there said: "It is objected that the bars of bullion possessed and disposed of by the defendant were not shown to have been the same bars taken from the deceased. It is true that there was no direct evidence that this was so, nor was it necessary that there should have been." We have no difficulty in holding this testimony admissible.

The defendant was asked on direct examination the question: "You didn't make any effort to secrete yourself during the next couple of days after the crime was committed?" The court sustained the state's objection, and its action is assigned as error. This question merely calls for a conclusion of fact from the accused. A mere legal conclusion is not a fact which can be met with proof. If the facts are stated the law determines the conclusion. *Bierne* v. *Ray,* 37 W. Va. 577. It is the province of the jury to determine the fact whether he secreted himself from all the circumstances in the case. For like reason a similar question propounded by the counsel for prisoner to the state's witness, VanLear, on cross-examination, was rejected by the court.

The next assignment of error is to evidence offered by the state, to the effect that the accused was without money immediately before the homicide and that he was seen with considerable money a few hours after the time that the crime was committed. Is this evidence admissible? Motive constitutes no element of the crime itself. *State* v. *Lemon,* 84 W. Va. 25. However, in cases where circumstantial evidence

is largely relied on for conviction, as in this case, then motive, becomes a matter of most earnest inquiry. *State* v. *Flanagan,* 26 W. Va. 116. The testimony in relation to the money in possession of the prisoner shortly after the crime, as well as the testimony showing that he was without means shortly before, is proper. This is fully sustained by the authorities. *State* v. *Sauls,* 93 W. Va. 276. Its tendency is to connect the prisoner directly with the commission of the murder, and also to disclose a motive for its commission. It was for the jury to consider whether or not the money which was shown in evidence in this case to have been in the possession of the prisoner on the night or morning of the murder, was the fruits of that crime.

The next assignment of error goes to the instructions. Section 1, Chapter 144, Barnes' Code, provides that murder \*\*\*\* in the commission of or attempt to commit robbery or burglary, is murder in the first degree. The question is as to whether there was any evidence to justify the court in instructing the jury upon that theory of the case? That there was, is clear. There was, so far as this record discloses, no other motive for the homicide than robbery, which the evidence tends to show, and which under our statute is made murder in the first degree and nothing else. Hence there is nothing from this standpoint upon which to predicate an instruction for murder in the second degree or for any of the degrees of manslaughter. As has been seen from the facts and circumstances attending the homicide, there was nothing upon which to rest any other theory of the case than first degree murder. The jury, therefore, in instruction No. 1, given on behalf of the state, were properly instructed that under the law of this state, murder in the commission of or an attempt to commit robbery is murder in the first degree, and if the jury believe beyond all reasonable doubt that the deceased, Buck Williams, was murdered by the defendant, while he, the defendant was engaged in commiting or attempting a robbery upon the said Buck Williams, then they should find the defendant guilty of murder in the first degree. This instruction, very clearly put its theory of the case before the jury.

Instruction No. 2 defined robbery as the theft of property from the person, or in the presence of the owner, accomplished by violence, or by putting him in fear. Robinson's Elementary Law, Sec. 434. This definition is approved in *State* v. *McAllister*, 65 W. Va. 97. It was properly given as the evidence in the case, all tended to show that the motive which induced the killing was robbery. Instructions Nos. 3 and 4 defined malice. Instructions Nos. 6 and 7 refer to the weight of evidence, the latter telling the jury they may convict on circumstantial evidence, if they believe beyond all reasonable doubt, from the facts and circumstances in the case, that the defendant was guilty. These instructions have never been questioned. The only exception urged in this court on the hearing was to instruction No. 5. This instruction, in effect, told the jury that in arriving at a verdict in the case, they were the sole judges of the facts and of the credibility of each and every witness introduced in the case, and that they had the right to disregard the testimony of any witness or witnesses who, in their opinion, may have testified falsely as to a material fact in the case, or give to the testimony of such witness such weight as, in their opinion, it may be entitled to; and, in ascertaining such weight, they might take into consideration the character, interest and motive of the witness as disclosed by the evidence in the case and his demeanor on the witness stand. This instruction was given and approved in *State* v. *Roberts*, 50 W. Va. 429; *State* v. *Staley*, 45 W. Va. 797; *State* v. *Parsons*, 90 W. Va. 307; *State* v. *Powers*, 91 W. Va. 737.

On behalf of the defendant, the Court gave to the jury the following instructions: "1. The Court instructs the jury that the defendant is by law presumed to be innocent, and that it is the duty of the State to prove him guilty, as charged in the indictment, beyond all reasonable doubt; and if the State fails to prove every material allegation in the indictment, then the jury should find him not guilty. 2. The Court instructs the jury that the presumption of innocence is not a mere form, to be disregarded by the jury at pleasure, but it is an essential part of the law of the land, and binding on the jury in this case; and it is the duty of the jury

to give the defendant in this case the full benefit of the presumption, and to acquit the defendant unless they feel compelled to find him guilty, as charged, by the law of the land, and the evidence in this case, convincing them of his guilt, as charged, beyond all reasonable doubt. 4. The Court further instructs the jury that the State in this case relies upon circumstantial evidence, and the jury is further instructed that circumstantial evidence should always be scanned with caution, and such evidence, to sustain a verdict of guilt, must be of such character and tendency as to produce a moral conviction of guilt beyond all reasonable doubt. 5. The Court further instructs the jury that before they can find the defendant guilty on circumstantial evidence alone, they should be convinced from the evidence of the guilt of the defendant, to a moral certainty, excluding every other reasonable hypothesis, but that of guilt, and that unless the evidence does, to a moral certainty, actually exclude every other reasonable hypothesis but that of guilt, they should find the defendant not guilty. 6. The Court instructs the jury that if the jury or any member of the jury, after due consideration of the evidence in this case and consultation with his fellow jurymen, has reasonable doubt of the guilt of the accused, it is his duty not to surrender his own conviction simply because the other jurors are of a different opinion.''

Complaint is made of the refusal of the Court to give instruction No. 3, which stated in substance that the burden was on the State to prove beyond all reasonable doubt malice, express or implied, before they could convict of murder in the first or second degree. Brill's Cyclopedia Crim. Law, sec. 645, states the rule: ''Under a statute which makes murder in the commission or in the attempt to commit a particular felony, such as robbery, murder in the first degree, the law will supply the necessary intent and malice in homicides coming within the provisions of the statute, and conviction may be had, although no previous intent to kill is shown, or it appears that there was no such intent, nor is it necessary to show deliberation, wilfulness or premeditation; therefore, it is not error to refuse the giving of an instruc-

tion telling the jury that the burden is upon the state to prove beyond all reasonable doubt, malice, express or implied." To the same effect, *Commonwealth* v. *Jones,* 1 Leigh 610; *Souther* v. *Commonwealth,* 7 Gratt. 673; *Howell* v. *Commonwealth,* 26 Gratt. 995; *Commonwealth* v. *Hanlon,* 3 Brewst. (Pa.) 461; *People* v. *Bealoba,* 17 Cal. 389; *State* v. *Brown,* 7 Ore. 186; *State* v. *Pike,* 49 N. H. 399. · Every evil intent and purpose in one engaged in such high crime is implied. Wharton on Homicide, Sec. 183.

The last assignment of error is that the Court erred in its refusal to set aside the verdict of the jury and grant to the accused a new trial. In *Betsall's Case,* 11 W. Va., at page 743, Judge JOHNSON said that where the jury found a party guilty in a criminal case, and a new trial is asked on the grounds that the evidence is insufficient to sustain the verdict, the appellate court will not grant a new trial, unless it is "irresistably clear that the conviction was wrong." The questions of fact in this case have been determined by the tribunal whose solemn duty it was to ascertain them.

We have carefully considered the record, and the assignment of errors based thereon, and find no reversible error. Juries must act on the circumstances as they appear, logical deduction made and presumptive proof, or leave the worst crimes go unpunished. The entire record satisfies this Court that the defendant had a fair trial under the law and has not been prejudiced in any of his substantial rights. This Court cannot say, viewing the chain of circumstances, all of which tended to show the defendant's connection with the crime committed, that the jury's verdict in fixing responsibility for the awful deed upon the defendant is not warranted by the evidence. The jury which found the prisoner guilty in this case, found him guilty of murder in the first degree without recommendation. The court in which he was tried, which heard and saw the witnesses testify, was moved to set aside the verdict and grant a new trial, because the verdict was contrary to the law and the evidence; but overruled the motion, and pronounced the solemn judgment. The judge of the circuit court upon examination

of the record found no error. According to well settled law and practice, this Court would not be warranted in reversing the judgment.    It is therefore affirmed.

*Affirmed.*