GEORGE MORGAN v. STATE OF NEBRASKA.

FILED JUNE 3, 1897. No. 8413.

1. **Criminal Law:** CIRCUMSTANTIAL EVIDENCE. The test by which to determine the sufficiency of circumstantial evidence in a criminal prosecution, is whether the facts and circumstances tending to connect the accused with the crime charged are of such conclusive nature as to exclude to a moral certainty every rational hypothesis except that of his guilt.

2. ———: ———: PROVINCE OF JURY. It is the province of the jury to determine the circumstances surrounding, and which shed light upon, the alleged crime; and if, assuming as proved the facts which the evidence tends to establish, they can be accounted for upon no rational theory which does not include the guilt of the accused, the proof cannot, as a matter of law, be said to have failed. (*Casey v. State*, 20 Neb., 138.)

3. **Homicide in Perpetration of Rape:** EVIDENCE. The body of deceased, a girl eleven years of age, who was last seen alive about 7 o'clock P. M., was, about 1 o'clock the next morning, found in an uninhabited building with unmistakable evidence of violence upon her person, including well-defined finger marks on the larynx; also below the left ear and under the chin. The face was swollen and discolored. The eyes and tongue were swollen and protruding, while contusions were apparent upon the head and lower limbs. Blood was oozing from the vagina, and the vaginal passage was torn and lacerated from the opening so far as explored. Her under clothing was torn from her person and there was blood on her thighs and private parts. There was also found in the vaginal

Morgan v. State.

passage a quantity of fluid which an experienced and apparently
capable chemist pronounced semen of a male person, and medical
witnesses concurred in the opinion that death resulted from stran-
gulation. *Held*, To warrant the conclusion that the deceased was
killed in the perpetration of a rape upon her person.

4. ———: ———. Evidence examined, and *held* to point with such cer-
tainty to accused as the perpetrator of the crime charged as to
warrant the verdict of murder complained of in this proceeding.

5. Statutes: ADOPTION OF JUDICIAL CONSTRUCTION. The legislature of
this state, in the enactment, in 1873, of the Ohio Criminal Code, is
presumed to have adopted the settled construction thereof by the
courts of that state.

6. ———: ———: EFFECT. But a construction of that statute by the
courts of Ohio is entitled to no greater consideration than pre-
vious decisions of this court, and will be rejected for reasons
which would require the overruling thereof had it been first
adopted in this state.

7. Homicide in Perpetration of Felony: MALICE: PRESUMPTION. Homi-
cide committed in the perpetration or attempt to perpetrate any
rape, arson, robbery, or burglary is by section 3, Criminal Code,
declared murder in the first degree. The turpitude of the act is,
in the exceptional cases mentioned in the statute, made to supply
the place of deliberate and premeditated malice, while a purpose
to kill is conclusively presumed from the intention which is the
essence of the enumerated felonies. (*Henry v. State*, 51 Neb., 149.)

8. ———: INFORMATION: INSTRUCTIONS. An information for murder
contained two counts, by the first of which the accused was
charged with the killing of deceased purposely and of his delib-
erate and premeditated malice, and by the second count, the killing
was alleged to have been done in the perpetration of a rape upon
the person of deceased. *Held*, Proper to instruct that murder in
the second degree, and manslaughter, are not included in the sec-
ond count, and that in case the accused is found guilty as therein
charged, the verdict should be for murder in the first degree.

9. Criminal Law: ASSUMPTION OF FACTS. It is not, in a criminal prose-
cution, error for the trial court to assume the existence of facts
asserted by the accused on the trial, or treated by him as proved.
(*Hill v. State*, 42 Neb., 503.)

10. ———: INSTRUCTIONS: OBJECTIONS NOT RAISED BELOW. Objection
to an instruction on the ground that it contains two or more dis-
tinct propositions will not be noticed when made for the first time
in this court. (*Smith v. State*, 4 Neb., 277.)

11. Circumstantial Evidence. It is in a criminal prosecution permissi-
ble for the state to introduce evidence of any number of facts and
circumstances tending to connect the accused with the crime
charged, and if the facts actually proved are sufficient to establish

47

guilt beyond a reasonable doubt, he is not entitled to an acquittal because of a failure of proof with respect to one or more of the facts relied upon for a conviction.

12. **Criminal Law:** JUROR: WAIVER OF OBJECTION. A party by failing to exercise his right of peremptory challenge will be held to have waived any objection on account of the disqualification of a juror then known to exist. (*Palmer v. State*, 4 Neb., 68.)

13. **Transcript for Review:** CORRECTION. It is a rule applicable to all appellate proceedings that the record of the trial court, when properly authenticated, imports absolute verity. If such record is partial or incorrect, the remedy is by means of an appropriate proceeding to secure a correction thereof in the lower court. (*Omaha Loan & Trust Co. v. Hogeboom*, 47 Neb., 7.)

14. **Criminal Law:** INTRODUCTION OF EVIDENCE: LIMITATION. It is within the discretion of the district court to place a reasonable limit upon the time for the production of evidence, and the exercise of such discretion is not, except in case of an abuse of power, the subject of review.

15. **New Trial:** ABSENT WITNESS. A new trial will not be allowed on account of the absence of a witness who on a subsequent day of the trial attends and testifies for the complaining party.

ERROR to the district court for Douglas county. Tried below before SCOTT, J. *Affirmed.*

The opinion contains a statement of the case.

*W. R. Patrick* and *W. S. Summers*, for plaintiff in error.

References to sustain the contention that there was error in the orders overruling challenges to jurors having opinions as to the guilt of the accused: *Olive v. State*, 11 Neb., 1; *Curry v. State*, 4 Neb., 545; *Carroll v. State*, 5 Neb., 31; *Cowan v. State*, 22 Neb., 523; *Miller v. State*, 29 Neb., 445; *Owens v. State*, 32 Neb., 167.

Where the evidence is circumstantial, the circumstances established must, to warrant a conviction, be such as to exclude every reasonable hypothesis, except that of the defendant's guilt. It is not sufficient that the circumstances create a probability, however strong. (*Botsch v. State*, 43 Neb., 501; *Dreessen v. State*, 38 Neb., 375; *Eliot v. State*, 34 Neb., 49.)

The trial judge should use the statutory language de-

scriptive of a crime in giving instructions, and no change from the statute can be made that may mislead or deceive the jury. (*Long v. State*, 23 Neb., 33.)

Instruction 13 was erroneous as invading the province of the jury. (*State v. Lee*, 60 N. W. Rep. [Ia.], 119; *Parrish v. State*, 14 Neb., 60; *Olive v. State*, 11 Neb., 1; *Young v. Hibbs*, 5 Neb., 433.)

The trial court is not permitted to indicate his opinion and thereby influence the jury by discussing the evidence or to give instructions which are commentaries on the testimony introduced. (*Omaha Fair & Exposition Ass'n. v. Missouri P. R. Co.*, 42 Neb., 111; *State v. Hudson*, 58 Mo., 138; *Smith v. State*, 43 Tex., 103.)

A charge that the law does not require the jury to be satisfied beyond a reasonable doubt of each link in the chain of circumstances relied upon to establish the defendant's guilt, is erroneous. (*State v. Gleim*, 17 Mont., 17; *Marion v. State*, 16•Neb., 349; *Kollock v. State*, 60 N. W. Rep. [Wis.], 817; *People v. Phipps*, 39 Cal., 333; *Commonwealth v. Webster*, 52 Am. Dec. [Mass.], 711.)

If any member of the jury entertained a reasonable doubt as to the sufficiency of the proof to establish any one material averment in the information against the accused he should have been free under the instructions to have given the accused the benefit of the doubt. (*Castle v. State*, 75 Ind., 146; *State v. Wilt*, 34 Kan., 488; *State v. Stewart*, 52 Ia., 284; *State v. Sloan*, 55 Ia., 217.)

Instruction 18 is erroneous because it states two propositions, and invades the province of the jury. (*Williams v. State*, 51 Neb., 711; *Long v. State*, 23 Neb., 33; *People v. Clarke*, 62 N. W. Rep. [Mich.], 1117; *Prime v. State*, 19 So. Rep. [Miss.], 711.)

The court in giving instructions cannot go outside of the theories advanced and the testimony given by the parties. (*People v. Wallin*, 55 Mich., 497; *Ingalls v. State*, 48 Wis., 647.)

The court should not single out, and give undue prominence to, certain features of the state's case. (*Williams*

*v. State*, 13 So. Rep. [Ala.], 333; *Hodgkins v. State*, 15 S. E. Rep. [Ga.], 695.)

An erroneous instruction is reversible error though a correct exposition of the law on the same point has been given to the jury. (*Barr v. State*, 45 Neb., 458; *Metz v. State*, 46 Neb., 547; *Raker v. State*, 50 Neb., 202.)

*C. J. Smyth, Attorney General*, and *Ed P. Smith, Deputy Attorney General*, for the state:

The mere fact that a juror has formed an opinion from what he has heard or read does not disqualify him from acting, or make him incompetent to serve. (*Bayse v. State*, 45 Neb., 261; *Bohanan v. State*, 18 Neb., 57; *Curry v. State*, 5 Neb., 412.)

If there was error in overruling challenges to jurors, it was without prejudice to defendant, as it does not appear in the record that he exhausted his peremptory challenges. (*Bohanan v. State*, 15 Neb., 209; *Palmer v. State*, 4 Neb., 68; *Nowotny v. Blair*, 32 Neb., 175; *Burnett v. Burlington & M. R. R. Co.*, 16 Neb., 332.)

The transcript of the proceedings imports verity and cannot be altered, amended, or impeached by affidavits. (*Dryfus v. Moline*, 43 Neb., 233; *Sullivan v. Benedict*, 36 Neb., 409; *Hagerty v. Walker*, 21 Neb., 596; *State v. Hopewell*, 35 Neb., 822.)

All that was necessary for the jury to find in order to convict accused of murder in the first degree under section 3 of the Criminal Code was that the killing was done while he was perpetrating, or attempting to perpetrate, the crime of rape. Deliberate and premeditated malice, if elements of the crime charged, is conclusively presumed when it is shown that the killing was done while perpetrating the crime of rape. (*Moynihan v. State*, 70 Ind., 126; *Titus v. State*, 9 Crim. Law Magazine [N. J.], 353; *Graves v. State*, 45 N. J. Law, 204; *Commonwealth v. Manfredi*, 162 Pa. St., 144; *Buell v. People*, 78 N. Y., 492; *State v. Gray*, 19 Nev., 212; *State v. Miller*, 13 S. W. Rep. [Mo.], 832; *State v. Hopkirk*, 84 Mo., 278.)

The statement in instruction 20, that the law does not require the jury to be satisfied, beyond a reasonable doubt, of each link in the chain of circumstances relied upon to establish defendant's guilt, is not ground for reversal when considered in connection with the entire charge. (*State v. Hayden*, 45 Ia., 11; *Bressler v. People*, 117 Ill., 422; *People v. Phipps*, 39 Cal., 326; *People v. Anthony*, 56 Cal., 397; *Koerner v. State*, 98 Ind., 7.)

POST, C. J.

The plaintiff in error was, at the September, 1895, term of the district court for Douglas county, convicted of murder in the first degree, and from the judgment imposing the extreme penalty therefor he prosecutes error to this court. The information which was the basis of the prosecution below contained two counts, in the first of which the accused was in substance charged with fatally assaulting the deceased, Ida Gaskill, with intent her, the said deceased, feloniously and of his deliberate and premeditated malice, to kill and murder; and by the second count thereof it was charged that the accused feloniously killed and murdered the said Ida Gaskill in the perpetration of a rape then and there committed upon her, the said Ida Gaskill, a female child under eighteen years of age, to-wit, of the age of eleven years. A verdict was returned finding the accused not guilty as charged in the first count of the information and guilty in manner and form as charged in the second count thereof. A motion for a new trial was interposed, in which were alleged numerous grounds for the setting aside of the verdict, and which are made the basis of separate assignments of the petition in error.

The questions to be determined in this proceeding may, it is believed, be greatly simplified by the preliminary observation that there exists no controversy respecting the *corpus delicti*. Indeed, the fact was conceded by counsel for the accused on the argument of the cause, and cannot, upon the record, be disputed, that the body of the

deceased, a girl eleven years of age, who was last seen alive about 7 o'clock P. M. of Sunday, November 3, 1895, was, about the hour of 1:30 in the morning following, found in an uninhabited building in the city of Omaha, with unmistakable evidence of violence before death, including well-defined finger marks on the neck and larynx; also below the ear and under the chin. The face was blue and swollen, the eyes and tongue were swollen and protruding, while contusions were apparent upon the head and lower limbs. Blood was oozing from the vagina, and the vaginal passage was torn and lacerated from the opening so far as explored. The underclothing of the deceased had been torn from the person, and there was blood on her thighs and private parts. There was also found in the vaginal passage a considerable quantity of fluid, which Dr. Detwiller, an experienced and apparently capable chemist, from a careful analysis, pronounced semen of a male person; and medical witnesses, of whom a number were examined, concurred in the opinion that death resulted from strangulation subsequent to the violation of the person of deceased in manner as charged. It is thus apparent that the important inquiry relates to the connection, if any, of the accused with the homicide proved, and to that subject our attention will now be directed.

For a month or six weeks previous to the tragedy above noted Mrs. Gaskill, mother of the deceased, with her family, consisting of the said Ida and her son Willie, aged nine years, had occupied rooms on the third floor of a building described in the record as No. 1814 Half-Howard street, in the city of Omaha, on the first floor of which was a suite of two rooms occupied by the accused and one Sanford, to whom further reference will hereafter be made. Among the acquaintances of the Gaskill family was Martin Booker, a single man, engaged on his own account as a teamster, and who resided at No. 1806 St. Mary's avenue, in the neighborhood of a half block distant. On the fatal Sunday, Ida and her brother, with

their mother's permission, dined with Booker, going to his rooms a little before noon, and returning home between 3 and 4 o'clock P. M. Ida, after the dinner with Booker, washed and put away the dishes of their host, and scrubbed the floor of his room, receiving therefor some trifling compensation tendered her. From the time of her return home until about 5:30 P. M. she was engaged alternately in assisting with the household duties and in play with companions of her own age in the neighborhood. Mrs. Gaskill, about the hour last named, in return of the hospitality shown her children, permitted Ida to go out for the purpose of inviting Booker to supper with her. After delaying the meal for an hour or more, and becoming alarmed on account of the prolonged absence of the child, search was instituted by the mother, which, with the assistance of officers Hudson and McGrath of the police force, finally resulted in the finding of her lifeless body as already narrated. The first meeting of Ida and the accused on that day, of which the record furnishes any positive evidence, was at Booker's rooms between 1 and 3 o'clock P. M., on which occasion there was, as testified to by Booker, some conversation between them which the latter did not overhear. Some time during the afternoon she visited the accused at his rooms, remaining for a few minutes only, at which time, as admitted by him to witnesses for the state, she sat upon his lap. She was, during the afternoon or evening, observed by Mrs. Van Horn to meet and speak to the accused while passing through an alley in the rear of the uninhabited building in which her body was subsequently found (by witnesses referred to as the "old red house"), to-wit, No. 1807 Half-Howard street. She was seen by Fanny Donovitch, a girl of her own age, a few minutes before 6 o'clock, returning from St. Mary's avenue by way of Booker's, and a little boy, Claude McCrum, testified to having seen her about the same time talking with Booker near the latter's house. She was also seen by Mr. Penny, who testified for the defense, at

6:30, when too dark for recognition except by her voice, coming from the direction of Booker's, and within a few feet of the door of the accused, where, in response to a question by some person, unseen by the witness, she answered, "Wait; I will be back in a minute," or in words of like import. Accused was seen in the vacant building and in the immediate vicinity thereof at different times during the afternoon and evening. John Flannigan, a teamster, while passing through the alley, spoke to him, at which time he was in one of the back rooms of said building; and later in the afternoon he attempted, according to the witnesses for the state, by beckoning and by means of other signs, to attract to said building two little girls of the age of deceased. He was seen by Mrs. Agnew to come from his room about twenty minutes before 6 o'clock and pass between the vacant building and the barn, and was by Mrs. Koch seen to return from the direction of St. Mary's avenue to the vicinity of said building about 5:30 or 6 o'clock.

But the witness, of all others, best qualified to speak from a personal knowledge of the movements of deceased that afternoon and evening was her brother Willie, who testified that subsequent to his return from Booker's he was the bearer to her of a message from the accused which amounted to a request for her to meet him, the accused, at the vacant building. In view of the important bearing of this testimony of the last named witness upon the question at issue, we here set out the material part thereof:

He [accused] was over there and told me. He said, "I have got something to tell you," and I said, "Tell it out." He said: "I will give you a nickel if you won't tell anybody. Don't tell it to your mother. Just keep it to yourself," and a man came along and talked to him a while, and he said, "Now remember, and don't tell;" and he told me to go up and tell Ida to come down, he wanted to see her; and I asked what he wanted to see her for, and he said he wanted to see her a minute; and I went

up and told her to come down, and she said she would come down in about ten minutes; and then I come down. * * * I said, "Hello;" and he began to tell me what I did tell you, and then he said, "I have got something to tell you;" and I said, "Tell it out;" and he said, "Sure you won't tell anybody,—your mother or any living soul?" and I said, "All right;" and then a man come back, and stopped and talked awhile; and I said, "Tell me;" and he said, "Now, won't you ever tell nobody?" And then we walked around the old house, and he told me to go up and tell Ida.

Q. What old house?

A. Where she was found.

Q. You saw him go around there?

A. Yes; I walked with him.

Q. Where did you leave him?

A. Down there by that old house.

Q. Now, did you go and tell Ida?

A. Yes, sir.

Q. Where did you find Ida at that time?

A. Up home; and I called her out, and mamma told her to go and see what he wanted, and she said, "I'll be down in about ten minutes."

Q. And then what did you do,—what did George [the accused] tell you when you told him that?

A. I told him, and we had had some money that he gave me and Ida; and he told me, "Here is a penny to go and get me some taffy;" and I went over and got it, and between 5 and 6 o'clock I was coming back, and Ida came down and said she was going over to Martin Booker's.

Q. When you came back from telling Ida, Morgan wanted to see her, where did you find Morgan?

A. Down in the house there.

Q. Found him in the house?

A. Yes, sir.

Q. In this old house?

A. Yes, sir. * * *

Q. Where were you? Which side of the house did you go on?

A. Out doors. I didn't go inside. I ran to see where he had gone; and then I looked in that second window and just got in time to see him jump into the closet, and said, "What are you hiding from?" and he said, "I ain't hiding." * * *

Q. Where was he when you asked him, "What are you hiding from?"

A. In the little closet where she was found.

We quote also as bearing upon the same subject from the testimony of Mrs. Gaskill, who, after stating that the deceased went out to play about 4:30 P. M., continued:

Q. How long was she out to play when she went out about 4 or half past 4 o'clock?

A. Well, as near as I can guess, it must have been an hour.

Q. So that she must have come back in the neighborhood of 5 or half past 5?

A. Yes, sir.

Q. Is that right?

A. I think so; she was home before half past 5. * *

Q. How long was she in the house before she left the last time to go to Martin Booker's?

A. Why, about half an hour. Between the time she was out to play and came in, she stayed with me about half an hour.

Q. Stayed about half an hour in the house before she went the last time?

A. Yes, sir.

The prosecution was conducted upon the theory, evidently accepted by the jury, that deceased left her home, as narrated above, for the double purpose of conveying her mother's invitation to Booker and of meeting the accused in response to his request. It was, in short, contended by the state that her little brother was made the unconscious instrument by means of which she was lured

to her destruction.   In this connection should be men-
tioned another set of facts tending strongly to connect
the accused with the crime charged.   That he had been
drinking to excess during that day is conceded by all.
He had, as early as 3 o'clock P. M., according to state-
ments made as a witness in his own behalf, visited a
neighboring saloon as often as six or eight times, and
had on each occasion taken one or more drinks of liquor.
He was seen during the afternoon with a bottle of liquor
in his possession.   To Mr. Henning, a newspaper reporter,
he stated that he drank that day a pint of whiskey in his
room,—that he was in fact drunk; and to officers Haze
and Hudson, by whom he was arrested at 3 o'clock the
next morning, he said, referring to his movements the
evening previous, that he had been drinking with some
friends and did not exactly know what he was doing.
He was found by the officers asleep in his rooms, and
appeared to be greatly perturbed when aroused.   The
only clothing upon his person at that time was a white
shirt, on the bosom of which was a spot of blood.   There
were bloody stains on the lower part of his shirt, and
on both sides of the front opening of the pantaloons he
is shown to have worn the day of the homicide.   There
was also blood under and around the finger nails and be-
tween the fingers of his left hand, while in one of his
pockets was found a handkerchief which appeared to
have been recently washed, still damp, and upon which
were distinct traces of blood.   Upon being asked for an
explanation of the blood upon his clothing and his per-
son, he professed his inability to account therefor.
Afterward he claimed to have gotten blood on his hands
and clothes while carrying dressed beef for one Murry,
a butcher, the Saturday previous, and later explained
the circumstance in question by saying that he first went
to bed without removing his pants, and that during the
night he became conscious of the fact that his nose was
bleeding profusely; that the blood therefrom was run-
ning through his mustache and upon his face; that he

succeeded, without arising, in stanching the flow of blood by the use of his handkerchief; that he was a second time awakened by the same means, and with the same result, except that he arose and removed his pants and again immediately returned to his bed. Unfortunately, however, for that contention, the six witnesses who, at the time of his arrest, or very soon thereafter, critically examined his person, failed to observe any blood upon his face or other facts which would indicate nose bleeding. He was contradicted also by Mr. Murry, who testified that he [accused] handled no meat on Saturday, but was engaged in washing windows, scrubbing floors, and going of errands only. Mrs. Whitman, who lodged in a suite of rooms next to those occupied by the accused and separated therefrom by a narrow hallway, in which is situated a hydrant and sink, testified to having heard a scream about 7 o'clock of the evening in question, as of one in pain or terror, from the direction of the "old red house" on the opposite side of the street, or from the livery barn across the alley therefrom, and that shortly before 8 o'clock she heard the water running in the sink above mentioned; also footsteps of some person passing between that point and the door of the accused, four or five feet distant. The accused testified in his own behalf that he last met deceased about 5:30 P. M. on the sidewalk near Booker's door, from which point he went direct to the saloon above mentioned, and thence, after a stay of ten or fifteen minutes, immediately to his room; that a half hour later he called for his mail at a neighboring hotel, being absent from home a few minutes only; that on discovering that his clock had run down, he returned to the hotel to get the correct time, which proved to be twenty minutes before 7; that he returned at once to his room where he remained until the time of his arrest, and that he retired for the night not later than 8 o'clock. He was to some extent corroborated by William Thompson, who testified that he [witness], in company with Sanford and another, were pres-

ent when, about 7 o'clock P. M., the accused left his room for the avowed purpose of ascertaining the time of day, and to the return to his room of the latter within a short time, not exceeding ten minutes thereafter. The said Martin Booker, who had previous to the arrest of the accused, been taken into custody on suspicion of complicity in the homicide, and held (but whether as a party defendant or as a witness does not appear), testified on rebuttal that he did not see the deceased after her departure from his house in company with her brother, between 3 and 4 o'clock; that within thirty minutes thereafter he went out in company with a neighbor, one Titus, in search of rooms for the latter, and was thus engaged, with the exception of the time necessarily employed in caring for his team, until about 8 o'clock, when, on parting with Titus, he returned home for his supper; that at the conclusion of his meal he again left home, going with Titus, upon the invitation of the latter, to his rooms, from which he returned home between 9 and 10 o'clock, and immediately retired.

The foregoing partial analysis presents the salient features only of the evidence, omitting minor circumstances and matters of detail confirmatory of the principal facts, and which, as argued by the state, point with such unerring conviction to the guilt of the accused as to exclude every reasonable doubt thereof. It is, on the other hand, strenuously insisted by the accused that he was entitled to a verdict of acquittal on the grounds, first, that his proof of alibi was complete; second, that the circumstances in evidence point with equal force to Booker as the perpetrator of the crime charged. Extended comment upon the evidence is deemed unnecessary at this point, particularly in view of the fact that further reference to that subject will be required in another connection.

The test by which to determine the sufficiency of circumstantial evidence in criminal prosecutions is substantially as asserted by the state, viz., whether the cir-

cumstances tending to connect the accused with the crime charged are of such conclusive nature as to exclude to a moral certainty every rational hypothesis except that of his guilt. (*Casey v. State*, 20 Neb., 138; *Dreessen v. State*, 38 Neb., 375; *Davis v. State*, 51 Neb., 301.) It is the province of the jury to determine the circumstances surrounding the alleged crime, and if, assuming as proved the facts which the evidence tends to establish, they can be accounted for upon no rational theory which does not include the guilt of the accused, the proof cannot be said to have failed. Accepting, therefore, as true the testimony of the state's witnesses, the evidence does, we think, point with such certainty to the guilt of the accused as to warrant the verdict found. While there was, it must be confessed, evidence strongly tending to contradict the witnesses for the state, and which, had it been credited by the jury, would doubtless have led to an acquittal, the question was largely one of veracity, as to which the verdict must, for the purpose of this proceeding, be accepted as conclusive.

Complaint is made of the overruling of the challenge for cause by the accused of John Grant and Peter Hill, called as jurors. It is shown that the juror Grant was excused by the prisoner in the exercise of his tenth peremptory challenge, and that he subsequently exercised his thirteenth challenge by excusing juror Kinsman. There is, however, nothing to indicate that he availed himself of his three remaining challenges, or that he was unable to excuse the jurors to whom the objection applied without exhausting his rights in that respect. He must, therefore, be held to have waived whatever error, if any, was committed in the overruling of his challenges for cause. (*Palmer v. State*, 4 Neb., 68; *Bohanan v. State*, 15 Neb., 209; *Burnett v. Burlington & M. R. R. Co.*, 16 Neb., 332; *Nowotny v. Blair*, 32 Neb., 175.)

Error is assigned in the excusing from the jury, as alleged, after the same had been selected and sworn, of one of the members thereof, thereby depriving the ac-

cused of his right of peremptory challenge with respect to the person selected in place of the juror so excused. It is shown by the transcript that on Saturday, November 30, the jury having been selected and sworn, an adjournment was taken until the Monday following, when upon the convening of court, and before the introduction of any evidence, proceedings were had which are thus recorded:

"It appearing to the court that since the impaneling of the jury in this case and their retirement to the jury room of this court in custody of bailiffs Savage and Williams, on the 30th day of November, 1895, Peter Kill, one of said jurors, duly empaneled and sworn to try this case, has become so violently sick and is now so indisposed as to be wholly unable to remain longer as a juror in this case without, in the opinion of the court, greatly endangering his life, and no evidence having as yet been introduced before the jury, the court upon its own motion hereby discharges said jury, the defendant in open court consenting and agreeing thereto.

"Whereupon the defendant and the state in open court, consenting and agreeing that a new jury shall be impaneled and sworn, and the trial of this cause proceed forthwith, and the defendant in open court agreeing to and waiving all objections to the other eleven jurors, who had been heretofore impaneled and sworn in this case, and James Collins having been selected and accepted as a juror in this case by the state and by the defendant, thereupon came the said persons, to-wit,   *   *   *   who, being selected and accepted by the state and by the defendant as a jury to try this case, are now duly impaneled and sworn according to law."

No question is raised of the power of accused to accept the jury as finally completed and sworn; and that the record quoted affirmatively shows such acceptance is expressly conceded. It appears, however, that on December 21, twelve days subsequent to the return of the verdict, a motion was interposed by accused for the correc-

tion of the record based upon affidavits of his counsel
denying the acceptance of the jury by him, or in his be-
half, and asserting that the action had on December 2
was over his express objection. But, so far as we are
advised by the transcript, said motion was never called
to the attention of the district court or a ruling had
thereon, and we are now in effect asked, in a strictly col-
lateral attack, to discredit the record, the highest and
most authentic evidence of judicial proceedings. It is
a fundamental rule, applicable to all appellate proceed-
ings, that the record of the trial court, when properly
authenticated, imports absolute verity. (*Worley v. Shong*,
35 Neb., 311; *State v. Hopewell*, 35 Neb., 822; *Dryfus v.
Moline*, 43 Neb., 233.) If such record be partial or in-
correct the remedy is by means of appropriate proceed-
ings to secure a correction thereof in the lower court.
(*Omaha Loan & Trust Co. v. Hogeboom*, 47 Neb., 7.)

It is assigned as misconduct of the trial court that the
judge, on the afternoon of December 4, announced that
the state would be required to close its case in chief be-
fore adjournment for that day, whereupon the county
attorney protested, saying that he desired to·call fifteen
or twenty additional witnesses; to which the judge re-
sponded that he "did not care if the state had five hun-
dred witnesses, he had made up his mind that it must
close that night, and it would have to be done." Such
statement, it is argued, must, by the jury, have been con-
strued as an intimation that the state was entitled to a
conviction upon the evidence already produced, and ac-
cordingly prejudicial in the highest degree to the ac-
cused. Of this assignment it may be said that it is ex-
tremely doubtful if there exists any foundation therefor
in the record. Indeed, we should, if it were necessary
to determine that question, feel constrained to hold that
the affidavits upon which it rests are not included in the
bill of exceptions allowed by the district judge. But;
assuming the question to be presented by the record, the
contention is without merit since prejudice to the defend-

ant, in a criminal prosecution, will not, as a matter of law, be presumed from the exclusion of witnesses for the state. The trial court may be, and in practice frequently is, required to place a limit upon the time for the production of evidence, and the exercise of such a discretion is not, in the absence of an abuse of power, the subject of review.

Among other matters testified to by the officers who searched the room of accused at the time of his arrest, was the finding of a wash basin containing water, and on the under side of which were spots of blood. With the apparent purpose of explaining that circumstance, accused testified on his own behalf to the purchase, on the Thursday preceding his arrest, of some fish, which, on his return home, were placed in the basin above described, and that he subsequently cleaned said fish in the presence of William Thompson on a table in his room, after which he washed his hands in said basin, which statement was, as regards the purchase and cleaning of the fish, corroborated by Thompson. The state in rebuttal, having offered expert evidence tending to prove that the stains on the inside of the accused's pants could not have been produced by blood of the fish, objection was interposed by the defense, when the following conversation ensued:

"Judge—There is no testimony before the jury that a drop of blood got off those fish and onto his [accused's] clothes.

"Mr. Baldrige (for the state): * * * I move to strike from the record all testimony as to the purchasing, cutting, and cleaning of fish on this table by the defendant.

"Judge: When the question was up before * * * I held that he might show the cutting of the fish, but, as I say, there is not a semblance of testimony that a drop of blood * * * from those fish got on the clothing of the defendant, and all the evidence about the fish is wholly immaterial for the reason that it is not connected.

48

"Mr. Baldrige: * * * Then my motion is renewed.

"Judge (addressing counsel for defendant): If you wish to recall the defendant and have him swear * * * that there was blood of those fish on his clothes, I will allow you to do it. Otherwise I will take the testimony from the jury.

"Mr. Patrick (for defendant): We do not desire to recall him.

"Judge: The ruling will be that the testimony in regard to the cutting and cleaning of the fish on the table will be stricken from the record as wholly immaterial."

To the striking out of such testimony the accused excepted, and the ruling in that regard is now assigned as error. It is not at this time claimed for the testimony stricken that it tended in any degree to explain the blood on the person or clothing of the accused. Counsel insist, however, that it was admissible as explanatory of the blood found upon the wash basin above referred to. The writer was from first impression inclined to that view, on the ground that such testimony might be said to bear, although remotely, upon that question. But we are, from a more careful scrutiny of the record, satisfied that it was wholly irrelevant to the issue, and that the court did not err in striking it out, since, as appears from the foregoing quotation, the motion and ruling embraced the testimony only so far as it relates to the cleaning of the fish, and not such parts thereof as tended to prove their contact, direct or indirect, with the basin.

. It is alleged that the county attorney was guilty of misconduct in secreting the witness Thompson. The evidence upon which that assignment rests is that on December 5 the witness could not be found when it was sought to call him in behalf of the defense, and that by direction of the county attorney he remained in the office of the latter throughout said day. Of the several answers to the argument advanced in this connection it is sufficient to mention one, viz., that the witness named

was subsequently called and examined by the accused, who cannot now be said to have been prejudiced by the action complained of.

Exception was taken to certain instructions given by the court on its own motion, the first of which relates to the manner of defining murder as charged in the separate counts of the information. Referring to the first count, it is said in paragraph No. 3: "The crime charged in the first count against the defendant is murder in the first degree. Murder in the first degree as charged in said count is thus defined by statute: 'If any person shall purposely, and of deliberate and premeditated malice, kill another, every person so offending shall be deemed guilty in the first degree. * * * The crime of murder in the first degree has three elements, to-wit: First, the killing of a human being; second, the killing must have been purposely and intentionally done; and third, the killing must have been done of deliberate and premeditated malice.'" The foregoing is followed by paragraphs defining in apt language murder in the second degree and manslaughter. And paragraph No. 12, which refers to the second count of the information, reads as follows: "The crime charged in the second count is thus defined: 'If any person in the perpetration or attempt to perpetrate any rape, kill another, every person so offending shall be deemed guilty of murder in the first degree.' Under the law, to warrant a conviction of defendant of the crime charged in the second count of the information, the state is not required to prove that the act of killing was done purposely and of deliberate and premeditated malice. The facts necessary to be established by the state by evidence beyond a reasonable doubt to warrant a conviction of the crime charged in the second count are, that the defendant in perpetrating or attempting to perpetrate a rape upon the said Ida Gaskill did choke, suffocate, or strangle her, the said Ida Gaskill, and of which choking, suffocation, or strangling by defendant she, the said Ida Gaskill, then and there

died." It is said in criticism of these instructions, first, that the accused was entitled to have section 3, Criminal Code, given to the jury as an entirety, instead of frag- · mentary parts thereof arranged in the order which, in the opinion of the trial court, the legislature should have adopted; second, that they are in substance vicious, since, as claimed, they exclude from the consideration of the jury, in connection with the second count, the lower degrees of homicide, and authorize a conviction for murder in the first degree without proof of malice, or of a specific intent to kill. Respecting the first ground of criticism, it is sufficient that the course pursued was, to say the least, appropriate for the purpose of an orderly presentation of the issues, and fair alike to the state and the accused. The second criticism presents a question of greater difficulty, and to which attention will now be directed, .viz., the meaning of so much of section 3, Criminal Code, as relates to homicides committed in the perpetration or attempted perpetration of the felonies therein enumerated. The language of the section in question is: "If any person shall purposely and of deliberate and premeditated malice, or in the perpetration or attempt to perpetrate any rape, arson, robbery, or burglary, or by administering poison or causing the same to be done, kill another  *  *  *  every person so offending shall be deemed guilty of murder in the first degree." In *Henry v. State*, 51 Neb., 149, it was held that the killing of a human being while the slayer is engaged in the perpetration or attempted perpetration of either of the designated felonies is, by force of the statute quoted, murder in the first degree. But what is there said may, in view of the fact that the conviction was for murder in the second degree, only be regarded as *obiter*, which fact, in connection with reasons hereafter appearing, has led to a re-examination, on our own motion, of the subject in the light of authority. It was held in *Robbins v. State*, 8 O. St., 131, that, while the terpitude of the felonious act is, in the exceptional cases mentioned

Morgan v. State.

in the statute, made to supply the place of deliberate and premeditated malice, the purpose to kill applies to each of the several classes of murder in the first degree, and is an essential element thereof. That case was, it should be remarked, decided eighteen years previous to the adoption by this state, in 1873, of the Ohio criminal code, and should be accorded due consideration in giving effect to the statute. There exists, notwithstanding the many adjudications in point, some diversity of opinion respecting the effect of constructions placed upon statutes previous to their adoption in other jurisdictions. Such a construction, it is sometimes said, becomes, upon the enactment of the statute by another state, an integral part of the act itself, having the force and effect of a legislative command. However, the more rational view, and the one sanctioned by authority, is that, except as applied to English statutes in force in this country at the time of the war of the revolution, the effect of such previous constructions is the same as of decisions by courts of last resort having jurisdiction of the particular controversy. (*Cathcart v. Robinson*, 5 Pet. [U. S.], 264.) The Ohio case must, therefore, be regarded as a construction of the statute, to be ignored or rejected only for reasons which would require the overruling thereof had the decision been pronounced by this court, and in that light it will now be examined. That case was decided by a bare majority of the judges, Swan and Brinkerhoff joining in a vigorous dissenting opinion, and the doctrine there announced has not been, so far as we can discover, subsequently asserted by that court, while it may be said to stand alone as an exposition of our own and cognate statutes. In *Brown v. State*, 7 Ore., 186, which was a prosecution for murder in the first degree under a statute in substance identical with ours, the reasoning in *Robbins v. State* was examined and rejected as wholly unsatisfactory, and the statute held to mean that whoever, while in the commission of or attempt to commit any rape, etc., kills another shall be deemed guilty of murder

in the first degree.    In *Buel v. People*, 78 N. Y., 492, it was
held murder in the first degree to cause the death of a
female, although unintentionally, while engaged in the
commission of a rape upon her person, under a statute
declaring the killing of a human being to be murder in
the first degree when perpetrated in the commission of
any felony.    In *People v. Johnson*, 110 N. Y., 134, and
*People v. Wilson*, 145 N. Y., 628, homicide committed in
attempting to escape from custody was held to be murder
in the first degree, such attempt, by statute, being de-
clared a felony.    In *State v. Hopkirk*, 84 Mo., 278 (over-
ruling *State v. Earnest*, 70 Mo., 520, and *State v. Hopper*,
71 Mo., 425), and in *State v. Miller*, 100 Mo., 606, it was
held proper to charge that whoever kills another in the
perpetration of one of the enumerated felonies is guilty
of murder in the first degree.    And Stephen, J., in *Reg.
v. Serne*, 16 Cox's Crim. Cas., 311, after holding death
resulting from a known dangerous act, done in the com-
mission of a felony, to be murder, makes use of the follow-
ing illustration: "Suppose that a man intending to com-
mit a rape upon a woman, but without the least wish to
kill her, squeezed her by the throat to overpower her, and
in so doing killed her, that would be murder.    *   *   *
That kind of a crime does not differ in any serious degree
from one committed by using a deadly weapon, such as
a bludgeon, a pistol, or a knife.    If a man once begins
attacking the human body in such way he must take the
consequences if he goes further than intended when he
began."    (See, also, *State v. Gray*, 19 Nev., 212; *People v.
Mooney*, 2 Ida., 23; *People v. Greenwall*, 115 N. Y., 54;
*Moynihan v. State*, 70 Ind., 126; *Robertson v. Common-
wealth*, 88 Va., 900; *Reddick v. Commonwealth*, 33 S. W.
Rep. [Ky.], 416; *Graves v. State*, 45 N. J. Law, 203; *People
v. Nichol*, 34 Cal., 211.)    The authorities here cited serve
to demonstrate the fallacy of the argument employed in
*Robbins v. State* as respects the grammatical construction
of the statute, as well as the policy and purpose thereof,
and our examination of the subject has suggested no

sufficient reason for adhering to a construction alike exceptional and obviously unsound.

The next assignment relates to the giving of instruction No. 13, viz.: "The crime of murder in the second degree and manslaughter are not included in the crime charged in the second count of the information. There are only one of two verdicts that can be rendered by the jury upon the second count under the law and the evidence, to-wit, that you find the defendant, George Morgan, guilty of murder in the first degree in manner and form as charged in the second count, or that you find the defendant, George Morgan, not guilty." The jury were by the foregoing, in effect, told that both a purpose to kill and the condition of mind essential to constitute murder in the first degree are incontrovertibly presumed from the crime of rape, in the perpetration of which the homicide is alleged to have been committed,—a proposition plainly implied from the instructions previously read, and which, as we have seen, is abundantly supported by authority.

By instruction No. 14 the jury were advised that if the accused, being eighteen years of age, caused the death of the said Ida Gaskill, a female child of the age of eleven years, in manner and form as charged in the second count of the information, the crime would be murder in the first degree, although the jury might believe that the sexual act, or the attempt thereto, was with the consent of the said deceased. But the crime when committed upon a child within the statutory age is, in this state, none the less a rape because done with her consent. (*Davis v. State*, 31 Neb., 247; *Head v. State*, 43 Neb., 30.) But if we assume the statute to refer to rape as originally defined, whereby the age of consent was ten years or upwards, the instruction could not have prejudiced the accused, since there is no evidence whatever tending to prove consent on the part of the deceased.

Exception was taken to the instructions Nos. 15 and 16, to the effect that the jury would be warranted, should

they find the facts as herein stated, in concluding that a rape had been perpetrated upon the person of the deceased and that she had by her assailant in the perpetration of said crime been choked to death. It was held in *Heldt v. State*, 20 Neb., 492, error for the trial court to assume the existence of a material fact, although there is no conflict in the evidence, on the ground that it is the province of the jury to judge of the credibility of witnesses. But in *Hill v. State*, 42 Neb., 503, it was held, following 1 Bishop, Criminal Procedure, 979, not error for the court to assume the existence of a fact which the accused has himself treated as proved. Counsel for the accused in this case, as we have seen in their oral argument, expressly conceded the *corpus delicti*, and should not, therefore, be heard to complain of the charge of the court with respect to that subject.

Particular stress is laid upon the objection to instruction No. 18, which is here set out: "Evidence is either direct and positive or presumptive and circumstantial. Evidence is direct and positive when the very facts in dispute are communicated by those who have had actual knowledge of them by means of their senses and where therefore the jury may be supposed to perceive the fact through the organs of the witnesses. It is presumptive or circumstantial, where the evidence is not direct, but where, on the contrary, a fact which is not directly and positively known is presumed or inferred from one or more other facts or circumstances which are known. The state claims that it has connected the defendant with the crime alleged in the second count of the information, not by direct and positive evidence, but by what has been herein defined as presumptive and circumstantial evidence. That is, the state has offered no evidence of a witness or witnesses who saw the act that is alleged in the second count of the information, which it is claimed resulted in the death of the said Ida Gaskill, but the state has offered the testimony of witnesses tending to prove a catalogue of facts and circumstances which

the state claims presumably and circumstantially con-
nects the defendant with the commission of the alleged
crime in said second count, and establishes his guilt of the
crime charged beyond a reasonable doubt." The objec-
tion to the foregoing is two-fold, viz., (1) that it embodies
two distinct and separate propositions which should,
under the provisions of section 55, chapter 19, Compiled
Statutes, have been separately stated and numbered; (2)
that it must, by the jury, have been construed as an in-
timation that the state was, upon the evidence adduced,
entitled to a verdict of guilty. The charge of duplicity
is, we think, unfounded. But, assuming the criticism to
be altogether merited, the objection on that ground was
waived by the general exception. (*Smith v. State*, 4 Neb.,
277.) Equally undeserved is the other objection. The
instruction assailed is, indeed, a fair statement of the
claim advanced in behalf of the state, and in nowise
prejudicial to the rights of the accused.

Exception was taken to instruction No. 21, which reads
as follows: "Before you can convict the defendant in
this case upon either count of the information it must
appear from the evidence beyond a reasonable doubt that
the defendant, and not someone else, committed the crime
charged.   *   *   *   It is not sufficient that the evidence
shows that the defendant or somebody else committed
the crime, unless the probabilities are so strong as to re-
move all reasonable doubt as to whether the defendant
or some one else is the guilty party." The foregoing
should be read in connection with paragraph 19, in which
it was said that in order to authorize a conviction it was
not alone essential that the circumstances should be in
harmony with the guilt of the accused, but that they
could not in the nature of things be true and the accused
be innocent, also, that they must be absolutely incom-
patible, upon any reasonable hypothesis, with the theory
of innocence, and incapable of explanation upon any
reasonable hypothesis other than that of the guilt of the
accused. These paragraphs, when read together, are in

harmony with the authorities above cited and correctly embody the rule applicable to the case at bar.

By paragraph No. 20 the jury were further charged as follows: "The law requiring the jury to be satisfied of the defendant's guilt beyond a reasonable doubt in order to warrant a conviction, does not require that you should be satisfied beyond a reasonable doubt of each link in the chain of circumstances relied upon to establish guilt. It is sufficient if, taking the testimony altogether, you are satisfied beyond a reasonable doubt that the defendant is guilty of the crime charged in the second count of the information. But if you have a reasonable doubt of the defendant's guilt because of the weakness of one link of the chain of circumstances relied upon by the state to establish the defendant's guilt, when taken and weighed by you with all the evidence in the case, it may fairly be said that a reasonable doubt exists in your minds, and you should acquit the defendant of the crime charged in the second count of the information." This instruction is vigorously assailed upon the ground that it authorizes a conviction although the proof may be insufficient to establish beyond a reasonable doubt one or more of the facts essential in order to warrant the conclusion of guilt,—a criticism we think wholly unmerited. The metaphor of the chain is, it must be confessed, inaccurate and misleading, inasmuch as the circumstances which the evidence tended to prove are not interdependent, i. e., each depending for its support upon the others. But the fatal weakness of the argument advanced in this connection is that it ignores the distinction between facts relied upon to sustain the particular charge and those facts which are necessary to the conclusion sought to be established. It is permissible for the state to introduce evidence of any number of facts and circumstances tending to connect the defendant on trial with the offense charged. In so doing it may be said to rely upon each and all of the facts thus sought to be established, and if those actually proved beyond a reasonable doubt are suf-

ficient to exclude to a moral certainty every reasonable hypothesis, save that of the defendant's guilt, he is not entitled to an acquittal because of a failure of proof with respect to one or more of the facts thus relied upon. · It may in truth be said that the many refinements and subtle distinctions attempted since the decision in *Commonwealth v. Webster*, 5 Cush. [Mass.], 295, has tended to confuse rather than to elucidate the subject under discussion. As a concise, and at the same time a comprehensive, statement of the rule, the following paragraph from the charge in that celebrated case has. been rarely equalled, and never excelled: "The next consideration is that each fact which is necessary to the conclusion [of guilt] must be. distinctly and independently proved by competent evidence. I say every fact necessary to the conclusion, because it may, and often does, happen that in making out a case on circumstantial evidence many facts are given in evidence, not because they are necessary to the conclusion sought to be proved, but to show that they are consistent with and not repugnant, and go to rebut any contrary presumption, * * * but not being necessary to the establishment of the main fact, if the witness was mistaken in the time, or in the fact itself, such failure of proof would not prevent the inference from other facts, if of themselves sufficient to warrant it. The failure of such proof does not destroy the chain of evidence. It only fails to give it that particular corroboration which the fact, if proved, might afford." Tested by that rule, the instruction given was quite as favorable to the accused as he was entitled to, and the exception based thereon is without merit. *Marion v. State*, 16 Neb., 349, relied upon to support the opposing view, has not been overlooked. We quite agree with what is there said, viz.: "If the word 'link' here refers to those circumstances which are essential to the conclusion, it is not a correct statement of the law." But whether such was the reasonable or necessary inference from the instruction there under consideration was not

decided, and we are unable to perceive wherein the views there expressed conflict with the conclusion reached in this case.

There are other assignments in the petition in error, but those upon which reliance is placed by counsel have been sufficiently noticed in the foregoing discussion. A patient examination of the record has satisfied us that there is therein no error prejudicial to the rights of the accused, and the judgment of conviction is accordingly affirmed and ordered to be executed October 8, 1897.

AFFIRMED.